**Dung C. TRAN, Plaintiff,**

v.

**STANDARD MOTOR PRODUCTS, INC.; International Union, United Automobile, Aerospace and Agricultural Implement Workers of America (UAW); and Local Union No. 710, International Union, United Automobile, Aerospace and Agricultural Implement Workers of America (UAW), Defendants.**

No. 97–2188–JWL.

United States District Court, D. Kansas.

May 29, 1998.

---

David R. Hills, Lenexa, KS, for Plaintiff.

Carl A. Gallagher, Deryl W. Wynn, McAnany, Van Cleave & Phillips, P.A., Kansas City, KS, John E. Kiley, Bud G. Holman, Thomas M. Licata, Kelley, Drye & Warren LLP, New York, NY, for Standard Motor Products, Inc., Defendant. Bruce C. Jackson, Jr., Gregory M. Power, Yonke, Arnold, Newbold & Regan, P.C., Kansas City, MO, for Intl. Union, United Auto Aerospace and Agricultural Implement Workers of America, Local No. 710 International Union, United Auto. Aerospace and Agricultural Implement Workers of America (UAW), Defendants.

John E. Kiley, Bud G. Holman, Thomas M. Licata, Kelley, Drye & Warren LLP, New York, NY, for Champ Service Line, Defendant.

## MEMORANDUM AND ORDER

LUNGSTRUM, District Judge.

Plaintiff Dung C. Tran filed suit against defendants Standard Motor Products, Inc., International Union (UAW) and Local Union No. 710(UAW) alleging violations of Title VII and § 1981 on the basis of his national origin and intentional infliction of emotional distress under state law.[1] Plaintiff also asserts a state law claim under the Kansas labor statute against defendant Union. This matter is presently before the court on defendants' motions for summary judgment (docs. # 79 and # 82). For the reasons set forth below, defendant Standard's motion for summary judgment is granted in part and denied in part. Defendant Union's motion for summary judgment is granted in its entirety.[2]

### I. Facts [3]

Defendant Standard Motor Products, Inc. is a New York corporation with a production plant located in Edwardsville, Kansas. Champ Service Line is a division of Standard Motor Products engaged primarily in the production of wire and cable for the automobile industry. Plaintiff Dung C. Tran began his employment with Champ Service Line in the Edwardsville plant as a production employee in September 1987. Plaintiff is a Vietnamese male. All production employees at the Edwardsville plant were covered by a collective bargaining agreement between Champ Service Line and defendant Union. Although plaintiff elected not to join the union, he was covered by the collective bargaining agreement.

*Standard's English–Only Policy*

In 1992, defendant Standard instituted a new organizational system in which employees were assigned to work in teams called "cells." A team developer supervises each team and is responsible for disciplinary issues and department productivity and quality. Beginning in August 1993, Steve Domann was the team developer for plaintiff's team. Shortly thereafter, Mr. Domann began telling team members, including plaintiff, to speak English during cell meetings and while working. Plaintiff concedes, however, that he was never told to speak English during lunch or other breaks. Plaintiff complained to Mr. Domann about the English-

1. For convenience, the court will refer to defendant International Union (UAW) and Local Union No. 710(UAW) collectively as "defendant Union."

2. Plaintiff has filed a motion for leave to file a rebuttal memorandum (doc. # 94). Because the court concludes, in any event, that plaintiff has

set forth sufficient evidence to withstand summary judgment on his discriminatory discharge claim, plaintiff's motion is denied as moot.

3. In accordance with the applicable summary judgment standard, the facts are uncontroverted or related in the light most favorable to plaintiff.

only policy at the time it was enacted and periodically through the time of his discharge.

*The October 1995 Incidents*

In October 1995, plaintiff was disciplined for inappropriately touching two female employees, Arlene Anderson and Williett Jones. At the time of the incidents, Ms. Anderson was a second-shift employee in the housekeeping department and Ms. Jones was plaintiff's supervisor. In early October 1995, plaintiff touched Ms. Anderson on the arm (*i.e.*, plaintiff patted Ms. Anderson on the arm below the shoulder). Ms. Anderson became angry and told plaintiff to stop touching her. On October 13, 1995, Ms. Anderson complained to her supervisor, Williett Jones, that plaintiff had repeatedly touched her. Later that day, Ms. Jones met with Curtis Lunn (the second-shift union representative), Ms. Anderson and plaintiff to discuss Ms. Anderson's complaints. During this meeting, Ms. Jones explained to plaintiff that he needed to "keep his hands to himself" and that such behavior could result in his discharge. Plaintiff admitted that he touched Ms. Anderson and agreed that he would not touch Ms. Anderson again.

On October 17, 1995, Ms. Jones met with plaintiff to discuss his productivity. At the conclusion of this meeting, plaintiff patted Ms. Jones on the shoulder as a way of saying "thank you" to Ms. Jones. Ms. Jones, however, believed plaintiff pushed her. In any event, Ms. Jones and Mr. Lunn met with plaintiff later that day and again told him that it was improper for him to be touching his coworkers.

On October 20, 1995, plaintiff received a written warning for this conduct. The written warning stated, in relevant part, as follows:

On 10–13–95 you were counseled concerning the placing of your hands on a female employee. On 10–17–95, after a conversation with your supervisor, you pushed her in the back as she turned to walk away. This type of behavior is unacceptable and will not be allowed.

The written warning also cautioned plaintiff that further violations would result in his discharge. The warning did not indicate that plaintiff had violated defendant Standard's sexual harassment policy or that plaintiff had engaged in sexual harassment.

*The October 1996 Incident*

On October 4, 1996, Dawnelle Ford, a female employee on the second shift, complained to Curtis Lunn that three of her coworkers, including plaintiff, had engaged in inappropriate conduct towards her. On October 8, 1996, Ms. Ford met with Curtis Lunn, Mark Lafond (Human Resources Manager), Jim Lane (Manufacturing Business Unit Manager), and Steve Domann to discuss her complaints. During this meeting, Ms. Ford reported that Lam Nguyen, Quy Tran and plaintiff had engaged in inappropriate conduct.[4] Specifically, Ms. Ford reported that plaintiff, on four or five occasions, had walked by her work area, whistled loudly to get her attention, and then flicked his tongue at her in an obscene manner. Ms. Ford did not report that plaintiff had touched her in any way.

After meeting with Ms. Ford, Mr. Lunn, Mr. Lafond, Mr. Lane and Mr. Domann began an investigation of her complaints by meeting individually with each of the three employees about whom Ms. Ford had complained. During the meeting with plaintiff, they explained the allegations made by Ms. Ford and asked plaintiff for his response. Plaintiff denied the allegations. At the end of this meeting, plaintiff was suspended with pay pending further investigation.[5]

During the investigation, Arlene Anderson approached Curtis Lunn and reported that she had information about plaintiff and Ms. Ford. On October 9, 1996, Mssrs. Lafond, Domann and Lane had a meeting with Ms. Anderson during which she informed defendant Standard that she had seen plaintiff touch Ms. Ford. Ms. Anderson signed a written statement which stated as follows:

I can't remember the exact date, but I remember I was sitting in the cafeteria at

---

4. Like plaintiff, Lam Nguyen and Quy Tran are Vietnamese.

5. Members of management also met with Quy Tran and Lam Nguyen, who admitted that they had engaged in the described behavior.

my usual table which faces the vending machines. I saw Dawnelle Ford at one of the vending machines, and she was facing the machine. Dung Tran approached her from behind and put his hands on her the way he used to do with me. Dawnelle turned around and looked at him, I couldn't hear what was said but it looked like she didn't like what he was doing. I thought about talking with her afterwards, but since I didn't know her I didn't say anything. I still haven't had any discussion with her concerning this subject.

After receiving this statement, management met with Ms. Ford to discuss the information received from Ms. Anderson. Although Ms. Ford recalled the incident in the cafeteria, she indicated that it happened "some time ago" and did not seem upset by the incident.

Boban Misic, another employee, also came forward during the investigation. After hearing about Ms. Ford's complaint, Mr. Misic told Curtis Lunn that he witnessed the incident between plaintiff and Ms. Ford (*i.e.*, the tongue-flicking) and would be willing to sign a statement if necessary. At this point, Mr. Misic's involvement in the investigation of Ms. Ford's complaint becomes the subject of much dispute. According to plaintiff's evidence, Steve Domann contacted Mr. Misic and offered to reduce Mr. Misic's accumulated attendance points if Mr. Misic agreed to sign a prepared statement that he had witnessed plaintiff engage in misconduct. Apparently, Mr. Domann rescinded this offer and Mr. Misic refused to sign the statement. Instead, Mr. Misic signed a statement indicating that he had not witnessed any misconduct by plaintiff.[6]

Despite Mr. Misic's belief that he had signed a statement indicating he had not witnessed any misconduct, defendant Standard somehow obtained a written statement purportedly signed by Mr. Misic indicating that Mr. Misic had seen plaintiff touch Ms. Ford. This statement reads as follows:

I have seen Dung Tran touching Dawnelle Ford. The times I remember were during, or after, our stretching break. I have seen him touch her on her leg, and pinch her on the back of her arm. I have also seen him stick his tongue out at her, and flick it in an obscene manner. Dawnelle has told me that she did not like what he was doing and wanted him to stop.

Mr. Misic has no recollection of signing this statement. In fact, according to plaintiff's evidence, Mr. Misic told defendant Standard that he had never seen plaintiff touch Ms. Ford. Mr. Misic only witnessed the tongue-flicking incident. In any event, management met with Ms. Ford to discuss the substance of the written statement purportedly signed by Mr. Misic. Ms. Ford told management that she "honestly couldn't remember" plaintiff ever touching her during or after the stretching break.

On October 10, 1996, defendant Standard terminated plaintiff's employment.[7] The disciplinary action form documenting his discharge stated as follows:

[Plaintiff] was found to have engaged in a form of sexual harassment, this is the second time in less than one year, and [plaintiff] was placed on final written warning Oct. 20, 1995. As a result of this second incident his employment with Standard Motor Products/Champ Service Line is terminated effective 10–10–96.

According to defendant Standard, the decision to terminate plaintiff's employment was based on Ms. Ford's complaint, the written statements of Ms. Anderson and Mr. Misic, and plaintiff's prior disciplinary warning.

---

**6.** Plaintiff's evidence is both unclear and inconsistent with respect to Mr. Misic's involvement in the investigation. Curtis Lunn, for example, testified that Boban Misic approached him and reported that he had seen the tongue-flicking incident. Mr. Misic's testimony, however, suggests that Mr. Domann contacted Mr. Misic "out of the blue" about his attendance points and the need for a statement against plaintiff. Thus, it is unclear whether Mr. Domann knew that Mr. Misic had seen the tongue incident at the time he asked Mr. Misic to sign a statement. Similarly, it is unclear from the record whether Mr. Domann

asked Mr. Misic to sign a statement that he had seen the tongue incident or, rather, to sign a statement that he had seen plaintiff touch Ms. Ford. According to Mr. Misic, Mr. Domann asked him to sign a statement that he had seen plaintiff "touch or grab" Ms. Ford. Suffice it to say that there are various inconsistencies with respect to Mr. Misic's involvement.

**7.** Quy Tran and Lam Nguyen were each suspended for two days and were given final written warnings for engaging in sexually harassing behavior.

## II. Summary Judgment Standard

When considering a motion for summary judgment, the court must examine all of the evidence in the light most favorable to the nonmoving party. *Jones v. Unisys Corp.*, 54 F.3d 624, 628 (10th Cir.1995). A moving party that also bears the burden of proof at trial is entitled to summary judgment only when the evidence indicates that no genuine issue of material fact exists. Fed.R.Civ.P. 56(c); *Anglemyer v. Hamilton County Hosp.*, 58 F.3d 533, 536 (10th Cir.1995). If the moving party does not bear the burden of proof at trial, it must show "that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

Once the movant meets these requirements, the burden shifts to the party resisting the motion to "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The nonmovant may not merely rest on the pleadings to meet this burden. *Id.* Genuine factual issues must exist that "can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Id.* at 250, 106 S.Ct. 2505. Summary judgment is not a "disfavored procedural shortcut;" rather, it is an important procedure "designed to secure the just, speedy and inexpensive determination of every action." *Celotex*, 477 U.S. at 327, 106 S.Ct. 2548(quoting Fed.R.Civ.P. 1).

## III. Plaintiff's Title VII and § 1981 Claims [8]

Plaintiff asserts several theories of recovery under Title VII and § 1981 against both defendants. With respect to defendant Standard, plaintiff claims discriminatory discharge and retaliation on the basis of his national origin. Plaintiff claims that defendant Union violated Title VII and § 1981 by refusing to grieve plaintiff's October 1995 discipline and based on Curtis Lunn's participation in the investigation of Ms. Ford's complaints. Finally, plaintiff asserts a hostile work environment claim against both defendants based on defendant Standard's purported English-only policy and defendant Union's endorsement of the policy. The defendants have moved for summary judgment on all claims.[9]

---

**8.** Both defendant Standard and defendant Union vigorously contend that plaintiff cannot state a cognizable claim under § 1981 based on national origin. *See Aramburu v. Boeing Co.*, 112 F.3d 1398, 1411 n. 10 (10th Cir.1997) ("Section 1981 does not protect individuals from discrimination based on national origin."). Throughout the course of this litigation, plaintiff has consistently maintained that his claim under § 1981 was based on race. At the pretrial conference, however, plaintiff agreed to change his "race" claim to a "national origin" claim, apparently without realizing the potential significance of the change. In his papers, plaintiff urges that he should not have been required at the pretrial conference to categorize his claim under § 1981 as race or national origin. Rather, plaintiff maintains that his claim is essentially one of ancestry discrimination and, thus, is cognizable under § 1981. *See id.* (claim of discrimination based on Mexican–American ancestry falls within § 1981's protection against racial discrimination) (citing *Saint Francis College v. Al–Khazraji*, 481 U.S. 604, 613, 107 S.Ct. 2022, 95 L.Ed.2d 582 (1987)). The court agrees with plaintiff. To prevent a manifest injustice to plaintiff, the court will allow plaintiff to amend the pretrial order to reflect that his § 1981 claim is based on ancestry or race discrimination. In any event, the court also agrees with plaintiff that the line between national origin discrimination and race discrimination is not often clear. *See Saint Francis College*, 481 U.S. at 614, 107 S.Ct. 2022 ("[T]he line between discrimination based on 'ancestry or ethnic characteristics' and discrimination based on 'place or nation of ... origin' is not a bright one.") (Brennan, J., concurring); *Manzanares v. Safeway Stores, Inc.*, 593 F.2d 968, 971 (10th Cir.1979) (Although § 1981 is directed to race discrimination, it is "not necessarily limited to the technical or restrictive meaning of 'race.'").

**9.** Defendant Union argues that all of plaintiff's Title VII claims against it are barred by plaintiff's failure to exhaust his contractual remedies set forth in the collective bargaining agreement. As defendant Union acknowledges, however, the Tenth Circuit has recently adopted the majority view and rejected this argument. *See Harrison v. Eddy Potash, Inc.*, 112 F.3d 1437, 1452–54 (10th Cir.1997) (plaintiff not required to exhaust grievance procedures provided in a collective bargaining agreement prior to pursuing Title VII claim in federal court). Apparently, the Supreme Court has granted certiorari on this issue in another case and, thus, defendant raises the issue for appeal purposes only. *See Wright v. Universal Maritime Serv. Corp.*, 121 F.3d 702, 1997 WL 422869 (4th Cir.1997), *cert. granted,* —— U.S. ——, 118 S.Ct. 1162, 140 L.Ed.2d 174 (U.S. Mar. 2, 1998) (No. 97–889). In any event, the court

As set forth in more detail below, the court concludes that a genuine issue of material fact exists with respect to defendant Standard's motivation in terminating plaintiff's employment and, thus, denies defendant Standard's motion for summary judgment with respect to plaintiff's discriminatory discharge claim. The court grants summary judgment, for the reasons set forth below, on plaintiff's remaining claims.

### A. Discriminatory Discharge

■ Plaintiff contends that defendant Standard terminated his employment in violation of Title VII and § 1981. The court analyzes plaintiff's discriminatory discharge claim under the familiar burden-shifting framework first pronounced in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).[10] In the summary judgment context, plaintiff initially must raise a genuine issue of material fact on each element of his prima facie case of discrimination. *See Randle v. City of Aurora*, 69 F.3d 441, 451 (10th Cir.1995).

Once plaintiff establishes his prima facie case, the burden shifts to defendant to offer a legitimate, nondiscriminatory reason for its employment decision. *Id.* (citing *McDonnell Douglas*, 411 U.S. at 802–03, 93 S.Ct. 1817; *EEOC v. Flasher Co.*, 986 F.2d 1312, 1317–19 (10th Cir.1992)). If the defendant comes forward with a nondiscriminatory reason for its actions, the burden then reverts to the plaintiff "to show that there is a genuine dispute of material fact as to whether the employer's proffered reason for the challenged action is pretextual—i.e., unworthy of belief." *Id.* (citing *Ingels v. Thiokol Corp.*, 42 F.3d 616, 622 (10th Cir.1994)). If the plaintiff proffers such evidence, the motion for summary judgment must be denied. *Id.*

■ As an initial matter, the parties dispute the appropriate framework of plaintiff's prima facie case. Defendant Standard urges that plaintiff must show that (1) he is a member of a protected class; (2) he was discharged for violating a work rule; and (3) that similarly situated nonminority employees were treated differently. *See Aramburu v. Boeing Co.*, 112 F.3d 1398, 1403 (10th Cir.1997). According to defendant, plaintiff's claim for discriminatory discharge fails at the prima facie stage because plaintiff has not set forth any evidence with respect to the third element of his prima facie case (*i.e.*, that similarly situated non-Vietnamese employees were treated differently).

Plaintiff, on the other hand, urges the court to apply the prima facie elements set forth in *Martin v. Nannie & the Newborns, Inc.*, 3 F.3d 1410, 1417 (10th Cir.1993). In *Nannie & the Newborns*, the Tenth Circuit identified the elements of a prima facie case of wrongful termination under Title VII as follows: "[T]he plaintiff must show that (1) she belongs to a protected class; (2) she was qualified and satisfactorily performing her job; and (3) she was terminated under circumstances giving rise to an inference of discrimination." 3 F.3d at 1417. Plaintiff argues that he has adequately established the third element of his prima facie case as set forth in *Nannie & the Newborns*.[11]

---

denies defendant's motion for summary judgment on plaintiff's Title VII claims for failure to exhaust his contractual remedies.

Defendant Union also moves for summary judgment on plaintiff's Title VII claims as against the international union on the grounds that it cannot be held liable for the conduct of local union representatives. In light of the court's disposition with respect to defendant Union's motion for summary judgment on the merits of plaintiff's claims, however, the court need not address this argument.

10. The court applies the same standards and burdens to plaintiff's § 1981 claims as applied to his Title VII claims. *See Aramburu v. Boeing Co.*, 112 F.3d 1398, 1410 (10th Cir.1997) (citing *Durham v. Xerox Corp.*, 18 F.3d 836, 838–39 (10th Cir.1994) (standards and burdens under § 1981 are the same as those under Title VII)).

11. Several other courts in this district have utilized the prima facie elements set forth in *Nannie & the Newborns*, albeit with little discussion. *See, e.g., Rawlins–Roa v. United Way, of Wyandotte, Inc.*, 977 F.Supp. 1101, 1105 n. 2 (D.Kan. 1997) (Vratil, J.) ("The Court finds the three part test enumerated by the Tenth Circuit in *Martin v. Nannie & the Newborns* to be the correct standard, particularly because 'similarly situated persons' are not present in every case of discrimination. Where similarly situated nonprotected individuals are present, disparate treatment may give rise to an inference of discrimination. Lack of similarly situated nonprotected individuals, however, will not in itself defeat plaintiff's claim."); *Varley v. Superior Chevrolet Automotive Co.*, No. 96–2119–EEO, 1997 WL 161942, at *13 (D.Kan. Mar.21, 1997); *Mason v. Mercy Hosps., Inc.*, No. 94–4076–SAC, 1997 WL 109975, at *7 (D.Kan. Feb.13, 1997);

■ The court finds that the particular factual context in which plaintiff's case arises merits application of the prima facie elements set forth in *Nannie & the Newborns.* Moreover, construing the evidence in the light most favorable to plaintiff, the court concludes that plaintiff has satisfied his prima facie case by producing sufficient evidence to create an inference of discrimination. *See Kenworthy v. Conoco, Inc.,* 979 F.2d 1462, 1469 (10th Cir.1992) ("The burden of establishing a prima facie case of discrimination ... is not onerous."); *Pitre v. Western Elec. Co.,* 843 F.2d 1262, 1265 (10th Cir.1988) (The prima facie burden "is satisfied by presenting a scenario that on its face suggests the defendant more likely than not discriminated against the plaintiff."). *See also Greene v. Safeway Stores, Inc.,* 98 F.3d 554, 559–60 (10th Cir.1996) (plaintiff produced sufficient direct and circumstantial evidence of age discrimination to proceed to trial without relying on *McDonnell Douglas* scheme).

Specifically, Boban Misic testified that he heard Steve Domann comment that he "didn't like" Vietnamese people. Although Mr. Misic only heard this statement on one occasion, Mr. Domann was intimately involved in the investigation of Ms. Ford's complaint against plaintiff. In addition, plaintiff averred that defendant had not hired any Vietnamese employees since sometime in 1993.[12] Moreover, Steve Domann's conversation with Boban Misic in which he offered Mr. Misic a reduction in his attendance points in exchange for Mr. Misic's signature on a prepared statement is highly suspect. Although Mr. Domann apparently rescinded his offer, his significant efforts to obtain statements against plaintiff, with an alleged disregard for the truth of those statements, raises a substantial fact question concerning Mr. Domann's motivation during the investigation of Ms. Ford's complaint.

Similarly, a reasonable factfinder could draw an inference of discrimination based on defendant Standard's purported reliance on the written statements of Mr. Misic and Ms. Anderson when Ms. Ford in large part disavowed the substance of those statements. When defendant Standard questioned Ms. Ford during the investigation about the statement purportedly signed by Boban Misic, Ms. Ford had no recollection of the "touching" incidents described in the statement. Despite the fact that Ms. Ford had no memory of the alleged conduct, defendant Standard based plaintiff's termination at least in part on this written statement.[13] Although Ms. Ford remembered the cafeteria incident described in Ms. Anderson's statement, she did not seem upset about the incident when management discussed it with her. Finally, the disciplinary action form terminating plaintiff's employment indicates that plaintiff engaged in sexual harassment for the second time in one year. Curiously, the disciplinary form plaintiff received in October 1995 did not refer to sexual harassment or any conduct of a sexual nature. Moreover, the complaints made by Ms. Anderson and Ms. Jones in 1995 did not appear to be sexual in nature at all. These apparent inconsistencies give rise to an inference of discrimination.

■ According to defendant Standard, the decision to terminate plaintiff's employment

---

*Jones v. Secretary, Dep't of Army,* 912 F.Supp. 1397, 1409 (D.Kan.1995) (Theis, J.).

12. Because plaintiff has failed to offer any evidence whether any Vietnamese individuals applied for positions with defendant Standard, this fact, standing alone, has little probative value.

13. Defendant Standard apparently believes that the truth or falsity of Boban Misic's written statement is irrelevant because Mr. Misic independently testified that he witnessed the tongue-flicking incident. Plaintiff was terminated, however, based on the substance of the statement itself, which included accusations of inappropriate touching. Because plaintiff had been disciplined for inappropriate touching less than one year earlier (and this prior discipline was cited as a reason underlying plaintiff's termination), the potentially false accusations with respect to plaintiff touching Ms. Ford are highly significant.

Along these same lines, defendant urges that it cannot be liable for discrimination even if the witnesses in the investigation "lied through their teeth," so long as defendant had a "good faith and well-founded" belief that plaintiff engaged in the misconduct of which he was accused. While the court certainly agrees with this principle and understands that its function is not to second-guess defendant Standard's personnel decisions, the court concludes that there is a factual issue with respect to defendant's "good faith" and motivation in connection with the investigation of Ms. Ford's complaint against plaintiff.

was based on Ms. Ford's complaint, the written statements of Arlene Anderson and Boban Misic, and plaintiff's prior disciplinary warning for inappropriate touching of female employees. The court concludes, however, that the same evidence used to establish plaintiff's prima facie case also raises an inference that defendant Standard's proffered reasons for terminating plaintiff's employment are pretextual. In essence, a genuine issue of material fact exists with respect to whether defendant Standard terminated plaintiff's employment at least in part because of plaintiff's national origin. *See Elmore v. Capstan, Inc.*, 58 F.3d 525, 530 (10th Cir.1995) (plaintiff does not need to prove that discriminatory factor was the "sole motivating factor in the employment decision").

In short, the court finds that defendant Standard terminated plaintiff's employment under circumstances giving rise to an inference of discrimination. Although the inference may not be a strong one, it is sufficient to entitle plaintiff to a jury trial on his discriminatory discharge claim. Defendant Standard's motion for summary judgment with respect to plaintiff's discriminatory discharge claim is denied.

### B. Retaliation

■ Plaintiff claims that defendant Standard terminated his employment in retaliation for plaintiff's complaints with respect to the alleged English-only policy. Defendant Standard moves for summary judgment on plaintiff's Title VII retaliation claim on the grounds that plaintiff failed to exhaust his administrative remedies with respect to this claim (*i.e.*, the claim is beyond the scope of plaintiff's EEOC charge). As set forth in more detail below, the court agrees with defendant and grants its motion for summary judgment with respect to plaintiff's Title VII retaliation claim.

The Tenth Circuit recognizes the rule that a complaint may include any claims of discrimination not listed in the administrative charge as long as such claims are "reasonably related" to the allegations in the charge. *See Aramburu v. Boeing Co.*, 112 F.3d 1398, 1409 (10th Cir.1997) (citing *Brown v. Hartshorne Pub. Sch. Dist. No. 1*, 864 F.2d 680, 682 (10th Cir.1988)). This rule is consistent with the purposes of the filing requirement—

to provide notice of the alleged violation to the charged party, and to provide the administrative agency with the opportunity to conciliate the claims. *Seymore v. Shawver & Sons, Inc.*, 111 F.3d 794, 799 (10th Cir.1997) (citing *Schnellbaecher v. Baskin Clothing Co.*, 887 F.2d 124, 126 (7th Cir.1989)).

In his charge of discrimination filed against defendant Standard, plaintiff set forth the following allegations:

I was discharged on 10–10–96 for alleged sexual harassment. I have been disciplined for alleged conduct infractions without having an opportunity to respond to the charges of improper conduct, these alleged improper conduct incidents has [sic] led to my discharge. Further, I and other Vietnamese have been told that we can only speak Vietnamese during break and lunch periods.

I believe that I have been subjected to different terms, conditions, and privileges of employment, told I can only speak Vietnamese during breaks and lunch and discharged, because of my National Origin—Asian and race—Vietnamese, in violation of Title VII of the Civil Rights Act of 1964, as amended.

There are no other allegations in the charge filed against defendant Standard. Moreover, plaintiff did not mark the "retaliation" box on the charge form.

Significantly, plaintiff's charge is devoid of any allegations with respect to retaliation. In fact, although plaintiff makes reference to the purported English-only policy, he does not allege that he complained about the policy or expressed concern about the policy to defendant Standard. Thus, a review of plaintiff's EEOC charge reveals that the purposes underlying the filing requirement—to provide notice of the alleged violation to the charged party, and to provide the administrative agency with the opportunity to conciliate the claim—have not been satisfied with respect to plaintiff's retaliation claim. *See id.* Moreover, plaintiff simply has not shown that an investigation of his national origin claims or his claims with respect to the English-only policy would reasonably include an investigation into a potential retaliation claim based on plaintiff's complaints about the policy. *See Martin v. Nannie & the Newborns, Inc.*, 3 F.3d 1410, 1416 n. 7 (10th Cir.1993)

("[C]onsideration of complaints not expressly included in an EEOC charge is appropriate where the conduct alleged would fall within the scope of an EEOC investigation which would reasonably grow out of the charges actually made.").

In short, the court does not believe that a retaliation claim based on plaintiff's complaints about the English-only policy is "reasonably related" to the allegations in plaintiff's charge submitted to the EEOC. *See Shawver & Sons*, 111 F.3d at 799 ("[W]here a retaliatory act occurs prior to the filing of a charge and the employee fails to allege the retaliatory act or a retaliation claim in the subsequent charge, the retaliatory act ordinarily will not reasonably relate to the charge."). Thus, the court grants defendant Standard's motion for summary judgment with respect to plaintiff's Title VII retaliation claim.

 The court also grants defendant's motion for summary judgment on plaintiff's claim for retaliation under § 1981.[14] In order to establish a prima facie case of retaliation, plaintiff must demonstrate that (1) he engaged in protected activity; (2) he suffered an adverse employment action either after or contemporaneous with his protected activity; and (3) a causal connection exists between his protected activity and the adverse employment action. *Berry v. Stevinson Chevrolet,* 74 F.3d 980, 985 (10th Cir.1996) (citing *Love v. RE/MAX, Inc.,* 738 F.2d 383, 385 (10th Cir.1984) (citing *Burrus v. United Tel. Co.,* 683 F.2d 339, 343 (10th Cir.1982))).

Assuming plaintiff could establish the first two elements of his prima facie case, he has failed to set forth sufficient evidence for a reasonable factfinder to conclude that a causal connection existed between his complaints about the English-only policy and his termination. Plaintiff first expressed concerns about the English-only policy in 1993. His discharge three years later, without more, simply does not support an inference that a causal connection existed between his complaints and his discharge.

The Tenth Circuit has underscored that unless the employer's adverse action "is very closely connected in time to the protected conduct, the plaintiff will need to rely on additional evidence beyond mere temporal proximity to establish causation." *Conner v. Schnuck Markets, Inc.,* 121 F.3d 1390, 1395 (10th Cir.1997). *See also Richmond v. ONEOK, Inc.,* 120 F.3d 205, 209 (10th Cir. 1997) (three-month period between plaintiffs' protected activity and her termination, standing alone, does not demonstrate a causal connection); *Redmond v. Day & Zimmerman, Inc.,* 897 F.Supp. 1380, 1386 (D.Kan. 1995) (no inference of causal connection where defendant terminated plaintiff's employment more than three years after plaintiff filed initial charge of discrimination) (citing *Burrus,* 683 F.2d at 343 (plaintiff failed to establish prima facie case of retaliation where three years passed between the filing of her charges and her termination)).

In short, plaintiff has failed to produce any evidence supporting a causal connection between his initial complaints about the English-only policy and his discharge three years later. Thus, the court grants defendant Standard's motion for summary judgment on plaintiff's retaliation claim brought under § 1981.

*C. English–Only Policy*

Plaintiff also claims that defendant Standard's purported English-only policy (and defendant Union's endorsement of the policy) constituted a hostile work environment in violation of Title VII and § 1981. Both defendants move for summary judgment on plaintiff's hostile work environment claim on the grounds that plaintiff failed to exhaust his administrative remedies with respect to this claim or, in the alternative, that the English-only policy did not constitute a hostile work environment.[15] As set forth in

14. Thus, even assuming plaintiff had adequately exhausted his remedies with respect to his Title VII retaliation claim, the court would grant summary judgment on the merits on this claim. *See Aramburu v. Boeing Co.,* 112 F.3d 1398, 1410 (10th Cir.1997) (standards and burdens under § 1981 are the same as those under Title VII).

15. Defendant Union also argues that plaintiff's claim with respect to the English-only policy is time barred because he failed to file a charge with respect to the policy within 300 days of the policy's enactment (i.e., sometime in 1993). *See* 42 U.S.C. § 2000e–5(e) (a charge of discrimination must be filed within 300 days after the alleged unlawful practice occurs). In light of the

more detail below, the court concludes that plaintiff adequately exhausted his administrative remedies with respect to this claim. Nonetheless, the court finds that the purported English-only policy does not constitute a hostile work environment. Accordingly, defendants' motions for summary judgment on plaintiff's claim with respect to the English-only policy is granted.

### 1. Exhaustion of Remedies

■ In both his charge filed against defendant Standard and his charge filed against defendant Union, plaintiff alleged that he was "told that [he] can only speak Vietnamese during breaks and lunch periods." Plaintiff did not allege that this conduct constituted a hostile work environment or that the policy constituted harassment based on national origin. Although it is a close question, the court believes that plaintiff's charge adequately provided notice to defendant Standard, defendant Union and the EEOC of a potential claim concerning restrictions on plaintiff's ability to speak Vietnamese.[16] Accordingly, plaintiff's claim based on the alleged English-only policy is "reasonably related" to the allegations in plaintiff's charges submitted to the EEOC and he has sufficiently exhausted his remedies with respect to this claim.

### 2. Merits of Claim

■ Although the Tenth Circuit has not addressed the issue, the EEOC regulations offer some guidance with respect to analyzing English-only policies. *See Sutton v. United Air Lines, Inc.,* 130 F.3d 893, 899 n. 3 (10th Cir.1997) ("It is well established that we must defer to the EEOC's regulatory definition unless it is 'arbitrary, capricious, or manifestly contrary to the statute.'" (quoting *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 844, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984))). According to these regulations, an employer "may have a rule requiring that employees speak only in English *at certain times* where the employer can show that the rule is justified by business necessity." 29 C.F.R. § 1606.7(b) (emphasis added).[17] Moreover, the handful of courts that have addressed English-only policies have upheld such policies so long as there is a legitimate business purpose for the rule. *See, e.g., Garcia v. Gloor,* 618 F.2d 264, 271 (5th Cir.1980); *Prado v. L. Luria & Son, Inc.,* 975 F.Supp. 1349, 1354 (S.D.Fla.1997).

Defendant Standard has asserted three reasons for instituting an English-only policy during working hours: (1) to ensure that all employees and supervisors could understand each other during cell meetings; (2) to prevent injuries through effective communication on the production floor; and (3) to prevent non-Vietnamese employees from feeling as if they were being talked about by Vietnamese employees. The court concludes that these reasons are legitimate business reasons for enacting an English-only rule. *See, e.g., Spun Steak,* 998 F.2d at 1483, 1490 (upholding English-only policy as applied to

court's ruling on the merits of plaintiff's claim, however, the court need not address this issue.

**16.** In a detailed affidavit attached to his charge filed against the Union, plaintiff further alleged that

> [f]or years, the union has agreed with the employer that Vietnamese employees cannot talk to one another while working in their Vietnamese language and can only speak [sic] Vietnamese language on breaks and lunch time. There is not [sic] safety reason for this rule. Vietnamese employees have been told that other employees got upset because they thought they were being talked about.

This language is sufficient to put defendant Union on notice of the nature of plaintiff's claim against it.

**17.** The regulations presume that an English-only policy applied at all times constitutes national origin discrimination. *See* 29 C.F.R.

§ 1606.7(a). Several courts, however, have rejected this presumption. *See, e.g., Garcia v. Spun Steak Co.,* 998 F.2d 1480, 1490 (9th Cir.1993) ("We are not aware of ... anything in the legislative history to Title VII that indicates that English-only policies are to be presumed discriminatory."); *Long v. First Union Corp.,* 894 F.Supp. 933, 940–41 (E.D.Va.1995) (upholding English-only policy applied at all times where plaintiffs were all bilingual and, thus, were not adversely affected by the policy). The court need not address this issue because there is no evidence (and plaintiff does not allege) that defendant Standard's purported English-only policy was applied at all times. Rather, the policy applied only during working hours. In other words, employees were free to speak other languages during breaks and meal times.

bilingual employees where policy was enacted to promote racial harmony, to enhance worker safety and to enhance product quality); *Prado*, 975 F.Supp. at 1354 (upholding policy enacted in part to ensure that management understood what was being said in order to evaluate employees in all work-related communications); *Long*, 894 F.Supp. at 941 (upholding English-only policy enacted to prevent employees from using Spanish to isolate and intimidate members of other ethnic groups and to alleviate tension in the workplace).

Moreover, plaintiff has failed to produce any evidence from which a reasonable fact-finder could conclude that defendant's English-only policy created a hostile work environment or was otherwise discriminatory. Significantly, there is no evidence that the purported policy was strictly enforced or that any employees were ever disciplined for failure to comply with the policy. In fact, plaintiff admits in his papers that many Vietnamese employees continued to speak Vietnamese despite the policy. Plaintiff also concedes that whenever Steve Domann was uncertain whether a Vietnamese employee understood instructions or information disseminated in English, he would ensure that the information was also explained to the employee in Vietnamese.

Finally, plaintiff has not shown that the policy adversely affected his employment in any way. It is undisputed that plaintiff is able to speak English and, as demonstrated by his deposition testimony, he speaks it reasonably well. Defendant Standard also offered its Vietnamese employees English language classes. Although plaintiff testified that he felt "ashamed and embarrassed" whenever a supervisor or another employee told him to speak English, the record is devoid of any evidence with respect to the frequency of these requests.

In light of this evidence, coupled with defendant Standard's legitimate reasons for enacting the policy, the court concludes that the English-only policy does not violate Title VII or § 1981. Accordingly, defendants' motions

for summary judgment on this claim are granted.[18]

### D. Remaining Claims Against Defendant Union

Although it is unclear from his papers, plaintiff may also be asserting a claim against defendant Union under Title VII and 1981 based on the Union's failure to grieve plaintiff's October 1995 discipline and based on Curtis Lunn's participation in the investigation of Ms. Ford's complaints. To the extent plaintiff asserts such claims, the court grants defendant Union's motion for summary judgment on these claims.

■■■ To the extent plaintiff's failure to grieve claim is brought pursuant to Title VII, the claim is clearly time-barred. *See* 42 U.S.C. § 2000e–5(e) (a charge of discrimination must be filed within 300 days after the alleged unlawful practice occurs). Plaintiff filed his charge of discrimination against defendant Union in May 1997—long after the expiration of the 300–day period. To the extent plaintiff's failure to grieve claim is asserted under § 1981, it is undisputed that plaintiff never even requested Mr. Lunn or any other union official to grieve his October 1995 discipline or that Mr. Lunn in any way refused to grieve the discipline. In the absence of such evidence, the court grants defendant's motion for summary judgment on plaintiff's failure to grieve claim to the extent it is brought under § 1981.

■■■ Similarly, the record is devoid of any evidence from which a reasonable factfinder could draw an inference of discrimination with respect to Curtis Lunn's participation in the investigation of Ms. Ford's complaints. The evidence simply shows that Ms. Anderson and Mr. Misic approached Mr. Lunn—in his role as union representative—to share information about plaintiff's conduct. It is undisputed that Mr. Lunn played no part in obtaining or attempting to obtain written statements from either individual. Finally, plaintiff argues throughout his papers that any animus Mr. Lunn harbored

---

**18.** The court's holding here is based solely on the particular factual context in which plaintiff's claim arises. In so holding, the court does not

foreclose the possibility that in some circumstances, an English-only policy may constitute a violation of Title VII.

was based on plaintiff's non-union status. Thus, the court grants defendant's motion for summary judgment on plaintiff's claim that Mr. Lunn's participation in the investigation constituted unlawful discrimination in violation Title VII and § 1981.

## IV. Kansas Employer and Employee Relations Act

■ Plaintiff also claims that defendant Union's conduct violated the Kansas Employer and Employee Relations Act, K.S.A. § 44–801 et seq.[19] Defendant Union moves for summary judgment on the grounds that plaintiff's claim is preempted by the National Labor Relations Act. As set forth in more detail below, the court agrees with defendant Union and grants its motion for summary judgment on plaintiff's claim.

Plaintiff alleges that defendant Union coerced and intimidated him to join a labor organization in violation of K.S.A. § 44–801 et seq. Section 44–803 provides as follows:

Rights of employees. *Employees shall have the right to* self-organization, to form, *join,* or assist *labor organizations,* to bargain collectively through representatives of their own choosing, and to engage in concerted activities, for the purpose of collective bargaining or other mutual aid or protection, and such *employees shall also have the right to refrain from any or all such activities.*

K.S.A. § 44–803 (emphasis added). Significantly, the language of K.S.A. § 44–803 is nearly identical to the language found in section 7 of the National Labor Relations Act.[20]

Section 44–809 makes it "unlawful for any person ... to coerce or intimidate any employee in the enjoyment of his or her legal rights, including those guaranteed in K.S.A. 44–803." K.S.A. § 44–809(12). The language of this provision is substantially similar to the language found in section 8 of the National Labor Relations Act, which makes it an "unfair labor practice for a labor organization or its agents ... to restrain or coerce employees in the exercise of the rights guaranteed in section 157 of this title." 29 U.S.C. § 158(b)(1).

Thus, the conduct alleged by plaintiff is not only prohibited by Kansas state law, but also arguably constitutes an unfair labor practice in violation of § 7 and § 8(b) of the National Labor Relations Act. It is well settled that "[w]hen an activity is arguably subject to § 7 or § 8 of the National Labor Relations Act, the States as well as the federal courts must defer to the exclusive competence of the National Labor Relations Board." *Viestenz v. Fleming Cos.,* 681 F.2d 699, 702 (10th Cir. 1982) (quoting *San Diego Bldg. Trades Council v. Garmon,* 359 U.S. 236, 245, 79 S.Ct. 773, 3 L.Ed.2d 775 (1959)). The *Garmon* preemption doctrine "is premised on Congress' desire to avoid conflicting rules of substantive law and remedy, thereby ensuring a consistent national labor policy." *Id.* (quoting *Garmon,* 359 U.S. at 242, 79 S.Ct. 773). In such circumstances, federal labor law preempts state law and the jurisdiction of the National Labor Relations Board is exclusive. *Id.* at 701–02, 79 S.Ct. 773.

Moreover, the Kansas Supreme Court has recognized that state courts must defer to the exclusive jurisdiction of the National Labor Relations Board when an activity is arguably subject to the provisions of the National Labor Relations Act. *See, e.g., Inland Indus., Inc., v. Teamsters & Chauffeurs Local Union No. 541,* 209 Kan. 349, 351–53, 496 P.2d 1327 (1972) (action in which union picketing allegedly violated § 44–809 preempted by National Labor Relations Act under *Garmon* pre-

19. Plaintiff makes no reference to section 12 of article 15 of the Kansas constitution in either his papers or the pretrial order. Therefore, any claim plaintiff may have had under this amendment is deemed waived and the court focuses its analysis on the Kansas Employer and Employee Relations Act, K.S.A. § 44–801 et seq.

20. Section 7 of the National Labor Relations Act reads as follows:

Employees shall have the right to self-organization, to form, join, or assist labor organiza-tions, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities, for the purpose of collective bargaining or other mutual aid or protection, and shall also have the right to refrain from any or all of such activities except to the extent that such right may be affected by an agreement requiring membership in a labor organization as a condition of employment as authorized in section 158(a)(3) of this title. 29 U.S.C. § 157.

emption doctrine where conduct arguably constituted an unfair labor practice under § 8(b)(4) of the Act); *Local Lodge No. 774 v. Cessna Aircraft Co.*, 185 Kan. 183, 189, 341 P.2d 989 (1959) (action brought by union under § 44–801 et seq. preempted by NLRA because "a state may not enjoin under its own labor statute conduct which has been made an unfair labor practice under the federal statutes"); *Asphalt Paving, Inc. v. International Brotherhood of Teamsters*, 181 Kan. 775, 784, 317 P.2d 349 (1957) (NLRB had exclusive jurisdiction where defendants engaged in conduct in arguably in violation of both § 44–809 and § 8(b)). Accordingly, the court concludes that plaintiff's claim is preempted by the NLRA and grants defendant Union's motion for summary judgment.

## V. Outrage

▬▬▬ Finally, plaintiff claims that the conduct of both defendants constitutes intentional infliction of emotional distress. As this court has previously noted, Kansas has set a very high standard for the common law tort of outrage. *See Butler v. City of Prairie Village*, 974 F.Supp. 1386, 1406 (D.Kan.1997). Moreover, "Kansas courts have been reluctant to extend the outrage cause of action to discrimination and harassment claims." *Bolden v. PRC Inc.*, 43 F.3d 545, 554 (10th Cir.1994). To establish a prima facie case of outrage, plaintiff must show that (1) defendants' conduct was intentional or in reckless disregard of plaintiff; (2) defendants' conduct was extreme and outrageous; (3) there is a causal connection between defendants' conduct and plaintiff's mental distress; and (4) plaintiff's mental distress is extreme and severe. *Id.* at 553 (citing *Moore v. State Bank of Burden*, 240 Kan. 382, 388, 729 P.2d 1205 (1986)); *Butler*, 974 F.Supp. at 1406. The threshold inquiries for the tort of outrage are whether "(1) the defendant's conduct may reasonably be regarded as so extreme and outrageous as to permit recovery and (2) the emotional distress suffered by the plaintiff is so extreme the law must intervene because no reasonable person would be expected to endure it." *Bolden*, 43 F.3d at 553 (citing *Roberts v. Saylor*, 230 Kan. 289, 292–93, 637 P.2d 1175 (1981)).

### A. Claim Against Defendant Standard

▬▬ In support of his outrage claim against defendant Standard, plaintiff alleges that Mr. Lafond, Mr. Lane and Mr. Domann committed perjury at plaintiff's unemployment hearing by offering into evidence the written statements of Arlene Anderson and Boban Misic when defendant allegedly knew these statements were false. Specifically, plaintiff maintains that defendant Standard did not inform the administrative law judge of three specific pieces of information: (1) that Dawnelle Ford never complained of the conduct set forth in Ms. Anderson's written statement; (2) that Ms. Ford could not remember and did not complain about the touching incidents set forth in Mr. Misic's written statement; and (3) that Mr. Misic's written statement describes plaintiff's tongue flicking as "obscene" although Mr. Misic never actually described this conduct as "obscene." Plaintiff analogizes this conduct to the conduct analyzed in *Taiwo v. Vu*, 249 Kan. 585, 822 P.2d 1024 (1991).

The omissions of Mr. Lafond, Mr. Lane and Mr. Domann are distinguished from the conduct described in *Taiwo*. In *Taiwo*, the Kansas Supreme Court found that the behavior of the defendant, Ms. Vu, was "intentional and malicious." *Id.* at 593, 822 P.2d 1024. Specifically, Ms. Vu lied to a law enforcement officer by falsely claiming that Mr. Taiwo had vandalized her car; she filed a false police report against the Taiwos concerning the vandalism; and she induced an employee to lie to the police about the Taiwos' involvement in the vandalism. *Id.* Ultimately, the court concluded that such conduct was sufficient to constitute the tort of outrage and upheld a jury verdict in favor of the Taiwos. *Id.*

Here, there is no evidence that Mr. Lafond, Mr. Lane or Mr. Domann engaged in any conduct during plaintiff's unemployment hearing in an effort to intentionally inflict emotional distress upon plaintiff. Even assuming defendant Standard withheld certain information during the hearing, such evidence suggests that defendant Standard was attempting only to preclude plaintiff from receiving unemployment benefits. In fact, plaintiff emphasizes in his papers that Mr.

Lafond, Mr. Lane and Mr. Domann were "displeased" with plaintiff's application for unemployment benefits and offered the statements of Arlene Anderson and Boban Misic into evidence in an effort to reverse the initial decision granting plaintiff unemployment benefits. Such conduct, while perhaps inappropriate and a potential basis for other relief, was not aimed at causing plaintiff severe emotional distress, but rather was aimed at saving defendant Standard the cost of plaintiff's benefits.[21] Finally, defendant Standard's conduct could not have inflicted emotional distress upon plaintiff because plaintiff admittedly did not know about the suspicious nature of the statements until April 1997—at least four months after his unemployment compensation hearing.

Construing the facts in a light most favorable to plaintiff, the court concludes that plaintiff cannot maintain an outrage claim against defendant Standard. Plaintiff has not alleged any conduct by defendant Standard which was so outrageous in character or so extreme in degree as to be beyond the bounds of decency or to be regarded as atrocious and utterly intolerable in a civilized society. *Bolden*, 43 F.3d at 554 (citing *Roberts v. Saylor*, 230 Kan. 289, 293, 637 P.2d 1175 (1981)). Thus, the court grants defendant Standard's motion for summary judgment on plaintiff's outrage claim.[22]

### B. Claim Against Defendant Union

Plaintiff also claims that Curtis Lunn's participation in the investigation of Ms. Ford's complaint against plaintiff (*i.e.*, directing defendant Standard to Arlene Anderson or Boban Misic and assisting defendant Standard in obtaining false statements in order to secure plaintiff's discharge) constitutes outrageous conduct. Defendant Union contends that plaintiff's outrage claim is preempted by the National Labor Relations Act or, in the alternative, that Mr. Lunn's conduct fails to constitute outrageous conduct under Kansas law.

### 1. Preemption

In *Farmer v. United Brotherhood of Carpenters*, 430 U.S. 290, 97 S.Ct. 1056, 51 L.Ed.2d 338 (1977), the Supreme Court considered whether the National Labor Relations Act preempted a California cause of action for the intentional infliction of emotional distress. In *Farmer*, a union member brought an action against the union for intentional infliction of emotional distress. 430 U.S. at 293, 97 S.Ct. 1056. The plaintiff alleged that the union had engaged in a "campaign of personal abuse and harassment" intended to punish him for complaints he made against the union local to higher union officials. *Id.* at 292, 97 S.Ct. 1056. Although recognizing that this conduct might form the basis for an unfair labor practice charge, the Court held that the plaintiff's claim was not necessarily preempted by federal law if the state had a substantial interest in regulating the challenged conduct and its regulation did not threaten undue interference with the federal regulatory scheme. *Id.* at 302, 97 S.Ct. 1056.

The Supreme Court, however, emphasized several limitations on this exception to the general preemption rule. According to the Court, concurrent jurisdiction would not be permitted where the state interest was not substantial or where emotional distress resulted from actual or threatened loss of employment itself, rather than from the particularly abusive manner in which the employment loss was accomplished or threatened. *Id.* at 305, 97 S.Ct. 1056. If either of these two conditions exists, then the potential for undue interference with the federal regulatory scheme would be intolerable. *Id.* at 305–06, 97 S.Ct. 1056.

The Tenth Circuit considered the scope of the *Farmer* holding in *Viestenz v. Fleming Cos.*, 681 F.2d 699 (10th Cir.1982). The plaintiff in *Viestenz* alleged intentional infliction of emotional distress in connection with an investigation into charges that he was stealing from his employer. 681 F.2d at 700.

---

21. In any event, defendant Standard's efforts were unsuccessful. Both the initial examiner and an appeals referee found in favor of plaintiff on his application for benefits.

22. In light of the court's ruling on the "extreme and outrageous" element of plaintiff's outrage claim, the court declines to address whether plaintiff's alleged emotional distress is sufficiently severe to constitute the tort of outrage.

During an investigative interview, the plaintiff admitted that he had stolen goods from his employer and was discharged shortly thereafter. *Id.* at 700–01. The plaintiff claimed that, during the interview, defendant's representative made unjustified threats to terminate his employment, to blackball him at the union, and to subject him to a court-ordered polygraph test. *Id.* at 701. Plaintiff claimed that this conduct and his ultimate discharge were based on his union activities. *Id.*

Relying on the *Farmer* exception to the preemption doctrine, the district court denied the defendant's motion to dismiss plaintiff's claim for lack of jurisdiction. *Id.* at 702. The Tenth Circuit reversed the district court, concluding that the plaintiff's claim did not fall within the *Farmer* exception and, thus, was preempted by the NLRA. *Id.* at 703–04. Specifically, the court held that the plaintiff's emotional distress had resulted from the fact of his discharge, rather than from any abusive conduct to which he was subjected. *Id.* at 704.

▆ Because plaintiff's claim here is based upon conduct which arguably constitutes an unfair labor practice,[23] it must satisfy the requirements of the *Farmer* exception to the *Garmon* preemption doctrine in order for the court to exercise jurisdiction. *See id.* at 703. In other words, the conduct must be sufficiently "outrageous" and the harm suffered by plaintiff must have resulted from the manner in which he was discharged, rather than from the fact of discharge itself. *See id.*

Applying the principles set forth in *Farmer* and *Viestenz,* the court concludes that plaintiff's claim against defendant Union for intentional infliction of emotional distress is preempted by the NLRA. Although plaintiff's claim is based upon the purported conduct of Curtis Lunn during the investigation that ultimately resulted in plaintiff's discharge, it is clear that the harm of which he complains resulted from the fact of his discharge, rather than from any allegedly improper conduct of Curtis Lunn. In his papers, plaintiff concedes that he experienced

the emotional effects of the alleged conduct "beginning with his termination on October 10, 1996." Plaintiff testified that he felt "ashamed and bad inside" as a result of his discharge and that since his termination, he has "been worried, afraid and scared about everything." *See Viestenz,* 681 F.2d at 704 (concluding that harm resulted from fact of discharge itself where plaintiff testified that his physical and emotional suffering occurred after he had been fired and related to his concern with providing for his family). *See also Magnuson v. Burlington Northern, Inc.,* 576 F.2d 1367, 1369 (9th Cir.1978) (claim for intentional infliction of emotional distress did not fall within *Farmer* exception despite plaintiff's claim that he was the victim of a conspiracy that led to his discharge), *cited with approval in Viestenz,* 681 F.2d at 704 n. 4; *Anspach v. Tomkins Indus., Inc.,* 817 F.Supp. 1499, 1513 (D.Kan.1993) (plaintiffs' claims against Union for intentional infliction of emotional distress preempted by NLRA where claims were based on Union's alleged participation in and condonation of sexual harassment, refusal to assist plaintiff in opposing sexual harassment, and failure to adequately represent plaintiffs in dealings with the company). Thus, the court concludes that "[t]he harm for which [plaintiff] seeks recovery resulted from his discharge, the propriety of which is within the exclusive jurisdiction of the NLRB to determine." *Viestenz,* 681 F.2d at 704. Defendant Union's motion for summary judgment is granted.

### 2. Sufficiency of Claim Against Defendant Union

▆ Even if plaintiff's outrage claim was not preempted by federal labor law, the court would nonetheless enter summary judgment in favor of defendant Union on the grounds that Curtis Lunn's alleged conduct does not meet the threshold requirements for an outrage claim under Kansas law. Plaintiff alleges that Curtis Lunn "guided and directed" Arlene Anderson and Boban Misic to defendant Standard and then assisted in obtaining false statements against plaintiff. These al-

---

**23.** In his papers, plaintiff maintains that Mr. Lunn sought to secure plaintiff's discharge based on plaintiff's non-union status.

legations, even if true, fall far short of establishing extreme and outrageous conduct.

There is no evidence that Mr. Lunn engaged in any behavior for the purpose of intentionally inflicting emotional distress upon plaintiff. In fact, plaintiff suggests in his papers that Mr. Lunn's conduct was done solely in an effort to coerce plaintiff to join the union. In any event, there is no evidence that Mr. Lunn was involved to the extent suggested by plaintiff. Rather, the record indicates that Ms. Anderson and Mr. Misic approached Mr. Lunn, as their union representative, with information about the pending investigation. Mr. Lunn then passed this information on to members of defendant Standard's management team. Thus, even if plaintiff's outrage claim was not preempted, the court would grant defendant Union's motion for summary judgment on the merits of the claim.

**IT IS THEREFORE ORDERED BY THE COURT THAT** defendant Standard's motion for summary judgment (doc. # 79) is **granted in part and denied in part.** Specifically, defendant's motion is granted with respect to plaintiff's claims of hostile work environment based on defendant's purported English-only policy; retaliation; and outrage. These claims are dismissed in their entirety. Defendant's motion for summary judgment is denied with respect to plaintiff's discriminatory discharge claim under Title VII and § 1981.

**IT IS FURTHER ORDERED BY THE COURT THAT** defendant Union's motion for summary judgment (doc. # 82) is **granted.** Plaintiff's case against the Union is dismissed in its entirety.

**IT IS FURTHER ORDERED BY THE COURT THAT** plaintiff's motion for leave to file a rebuttal memorandum (doc. # 94) is **denied as moot.**

**IT IS SO ORDERED.**