**Doris ROMAN, Plaintiff,**

v.

**CORNELL UNIVERSITY and Claude Poux, Defendants.**

No. 97–CV–0365.

United States District Court, N.D. New York.

June 30, 1999.

Shaw, Currey Law Firm, Ithaca, NY (William R. Shaw, of counsel), for Plaintiff.

Office of the University Counsel, Cornell University, Ithaca, NY (Nelson E. Roth, Valerie L. Cross, William R. Shaw, of counsel), for Defendants.

## MEMORANDUM—DECISION & ORDER

McAVOY, Chief Judge.

Plaintiff Doris Roman ("plaintiff" or "Roman"), who was fired from her job with Defendant Cornell University ("Cornell"), commenced the instant litigation against Cornell and her supervisor, Defendant Claude Poux ("Poux"), alleging causes of action for violations of her civil rights (42 U.S.C. § 1981), discrimination (42 U.S.C. § 2000e, et seq.; N.Y.Exec.Law § 296 (the "Human Rights Law" or "HRL")), and state law claims for breach of contract, negligent failure to supervise, failure to investigate, and the intentional infliction of emotional distress. Currently before the Court are defendants' motion to dismiss the Complaint pursuant to Fed.R.Civ.P. 12(c), or, in the alternative, for summary judgment pursuant to Fed.R.Civ.P. 56, and plaintiff's cross-motion for summary judgment.

## I. BACKGROUND

Cornell operates a College of Engineering (the "College"). Within the College, Cornell has established the Engineering Minority Programs Office ("EMPO"). The purpose of EMPO is to recruit and retain minority students in the College. At all times relevant hereto, Poux, an African American male, was the director of the EMPO.

In December 1993, Cornell posted an opening for the position of Assistant Director of the EMPO. After conducting a nationwide search, on August 1, 1994, Cornell hired plaintiff, a Hispanic female, as the Assistant Director of the EMPO. The decision to hire plaintiff was made jointly by John Hopcroft ("Hopcroft"), Dean of

the College; Mark Spiro ("Spiro"), Associate Dean for Administration of the College; Gerald Rehkugler ("Rehkugler"), Associate Dean for Undergraduate Programs and Student Services; Deborah Cox ("Cox"), then-director of the College's Human Resources department; and Poux. See Def.Ex. E; Mar. 30, 1998 Roman Dep., at 84–99; Cox.Aff., at ¶ 3, Def.Ex. F. Poux signed the actual letter offering plaintiff the position and copied it to Cox, Hopcroft, Rehkulger, and Donna Lawton. Plaintiff worked under the direct supervision of Poux.

At the beginning of her employment at the EMPO, plaintiff had a non-work related incident with Sonja Baylor ("Baylor"), an African–American female, who was then working as an administrative assistant in the EMPO. Baylor had sublet her apartment to plaintiff, and a dispute ensued over extermination costs. Although the source of this incident was not work-related, it affected plaintiff's working relationship with Baylor. See Oct. 19, 1998 Roman Dep., at 92–93. Apparently, Baylor also was unhappy with the change in office structure, which included the addition of plaintiff. Thus, there were some tensions between plaintiff and Baylor from the beginning.

In October or November 1994, relationships in the EMPO began to further deteriorate. Plaintiff had regular meetings with Cox to discuss job-related concerns and, in particular, issues relating to communications (or the lack thereof) within the EMPO. Plaintiff felt that there were inadequate policies governing the EMPO's operations and that she was frequently excluded from certain office communications. During these meetings, Cox discussed plaintiff's difficulties in meeting certain job responsibilities, including writing reports and grant proposals. Cox also counseled plaintiff on the inappropriateness of using profanity in the office and in electronic mail ("e-mail") messages.

Cox reported her displeasure with the use of profanity in the office to Poux, who expressed similar concern. The EMPO staff frequently used profanity in the office. In one instance, Baylor used vulgar language with Poux. As a result, on October 28, 1994, Poux sent an e-mail to the EMPO staff (plaintiff, Baylor, and Ann Hendricks ("Hendricks")) which read, in part, as follows:

I have been concerned about the level of professional behavior in empo, and am taking this opportunity to remind everyone of some pretty basic ground rules for interaction:

1. Obscene gestures, particularly when directed at an individual, are strictly prohibited.

2. Obscene language, especially when directed at an individual, is absolutely unacceptable.

This is a serious issue. If there are infractions . . . disciplinary action, as appropriate, will be taken.

Def.Ex. L.

On November 11, 1994, Baylor and Hendricks complained to Cox that plaintiff had an emotional outburst in the office, used vulgar language, and threatened them with the loss of their jobs (the "November 11 incident"). This incident was the result of plaintiff having purchased a briefcase with the expectation that the EMPO would pay for it, and her being informed that the EMPO could not pay for the briefcase due to budgetary reasons and that plaintiff would have to return the briefcase. Plaintiff admitted that an incident occurred, but denied its severity claiming that "[m]y tone and maybe choice of words may have been misinterpreted[,] . . . [and that] I do not use that kind of language in a professional environment." Def.Ex. T. According to Cox, plaintiff went to Cox's office on November 14, 1994 and admitted that she had lost her temper and used inappropriate language. Cox Aff., at 9.

By mid-November, the College's administration became concerned over plaintiff's behavior and considered terminating her. *See* Cox Aff., at ¶¶ 11, 14; Def.Ex. N. Specifically, the College felt that plaintiff was attempting to undermine Poux's authority as director of the EMPO. On November 15, 1994, Spiro sent an e-mail to Cox stating:

I think it important that we [ ] modify [Roman's] behavior because I'm concerned that she is undermining [Poux's] leadership. [Roman] must increasingly come to understand that we firmly and unequivocally support Poux. Second, she needs to see that her success at Cornell is dependent on his evaluation of her work and his support. She needs to bring workplace problems to him (not us) and to resolve them with him. I leave the details to you but I believe that is the type of behavior modification needed here.

Def.Ex. N.

Later that day, Cox drafted an e-mail message to Spiro stating:

I met with [Roman] . . . and told her that she needed to deal directly with Poux. She confessed that she had threatened the staff. . . . I told her that her behavior was inexcusable—that it represented a lack of respect for people and also an abuse of her power as an Assistant Director. I also told her that I was receiving feedback that she was undermining Poux and negatively representing the EMPO program and the university. I told her that her success at Cornell depended on her positive support of all three. . . . If she couldn't do that she shouldn't work here.

*Id.* Spiro responded to Cox writing "[m]y view at this point is that [Roman] probably should be outplaced because of her deteriorating relationship with the staff and because it increasingly appears that she cannot do the work." *Id.*

After the November 11 incident, Cox learned from Baylor and Hendricks that there had been other incidents of inappropriate conduct by plaintiff. Because the College was contemplating terminating

plaintiff, Baylor and Hendricks were asked to document their recollection of any such incidents. *See* Def.Exs. BB, CC, and DD; Cox Aff., at ¶ 11.

On November 15, 1994, Baylor sent an e-mail to Poux documenting her recollection of several incidents when plaintiff allegedly acted in an inappropriate manner. *See* Def.Ex. O. Baylor's e-mail reported several incidents regarding plaintiff, including: plaintiff speaking negatively about Poux's ability to supervise and manage the EMPO, plaintiff stating at a staff meeting that Gloria Guilford was engaging in sexual relations with Hopcroft to be promoted, plaintiff admitting to falsifying her resume, and plaintiff permitting a student to use the EMPO fax machine in contravention to office policy.

On November 18, 1994, Poux issued a disciplinary warning to plaintiff regarding the November 11, 1994 incident. The letter read as follows:

> On the morning of Friday, November 11, 1994, in the EMPO suite, you threatened staff members Sonja Baylor, Ann Hendricks and me (in absentia) with our jobs, and then hurled numerous invectives and expletives at Sonja and Ann. Further, you indicated to them in no uncertain terms that you were going against my direction to you to return the briefcase that you purchased with the following statement: "I am not returning that fucking bag...."

> This behavior is totally and completely unprofessional and unacceptable. Insubordination, threatening and abusive behavior, be it physical, verbal, and/or psychological, as well as repeated prevarication about individuals, will not be tolerated under any circumstances.

> This is an official University warning to you that if there are ever displays of such behavior again, further disciplinary action, including the possibility of termination, will result.

> I recommend that you seek assistance in remedying this situation.

Def.Ex. P. In late November or early December, Poux reported to Cox and Spiro that he had contacted an acquaintance, the Dean of Students at Rennselaer Polytechnical Institute ("RPI"), regarding plaintiff. Plaintiff had previously been employed by RPI. According to Poux, his acquaintance stated that, in the last two years of her employment, plaintiff "was withdrawn and secretive, ... became uncooperative and argumentative, and engaged in the 'backbiting and undermining' other staff" and her supervisor. *See* Def.Ex. Q.

On November 10, 1994, the EMPO adopted a policy prohibiting students from using the office fax machine, except in an extreme emergency and provided the student paid a fee. *See* Baylor Aff., at Ex. B. Shortly after the fax machine policy was implemented, an incident occurred regarding a student's use of the EMPO fax machine. Alberto Lazaro ("Lazaro"), who was fluent in English and Spanish, went to the EMPO office to use the fax machine to transmit a document relating to a job. Lazaro was informed by the receptionist in English that students were not permitted to use the fax machine. Lazaro then complained to plaintiff in Spanish. Plaintiff then informed the receptionist in English that Lazaro could send the fax or that plaintiff would send the fax for him.

Baylor and Hendricks, who do not speak Spanish, complained to Poux that plaintiff was speaking Spanish in the outer office area of the EMPO for the purpose of excluding them. *See* Baylor Dep., at 83. Poux relayed this incident to Cox and Hopcroft. Hopcroft and Cox advised that Poux should direct plaintiff not to carry on extended conversations in a foreign language for the purpose of excluding others. *See* Pl.Rule 7.1(a)(3) Statement, at 3; Hopcroft Dep., at 28.

On November 29, 1994, Poux discussed several issues with plaintiff. The conversation was memorialized in a memorandum from Poux to plaintiff that read:

> As we discussed in a 1 P.M. meeting today, you understand and are aware of

the following concerns with respect to your presence in EMPO:

1. Having extended conversations in Spanish in the presence of individuals who do not understand Spanish is inappropriate and inconsiderate and will cease immediately.

2. Instructing students to have meetings in EMPO with no staff is unacceptable and against Office Policy; it will not happen again.

3. Informing students about personnel difficulties pertaining to the office is completely unacceptable, and will not be tolerated.

Def.Ex. S.

On November 30, 1994, plaintiff sent an e-mail to Cox stating:

I need to see you at your earliest convenience for I have received another warning letter from my supervisor and at this point given this letter and other incidents in the office, I am coming to the conclusion that I may be PERCEIVING HARASSMENT!!

Pl.Ex. F (emphasis in original).

On December 6, 1994, plaintiff sent a letter to Poux regarding the warnings she received on November 18 and November 29. Plaintiff expressed her dissatisfaction with "the lack of appropriate communications, and cooperation in EMPO ... [and] the gossip mill [in the EMPO office]." Def.Ex. T. Plaintiff denied using inappropriate language in the office, stating that "I can understand how I could have been misinterpreted, especially since my tone was very stern." Id. Plaintiff also denied having been insubordinate, threatening, or abusive. Plaintiff continued to state that she had never been apprised before that her speaking Spanish was a problem and that she thought she made a professional decision to permit the students to use the EMPO office with no staff present, despite any EMPO policy. Finally, plaintiff denied having informed students about personnel difficulties in the EMPO.

Poux responded to plaintiff by letter dated December 13, 1994, advising her that he would process her letter as a formal grievance.

On December 12, 1994, Baylor sent Cox an e-mail regarding a telephone call from Greg Nelson ("Nelson"), a College alumnus who was then working for Exxon and who was chairman of the College's Industrial Advisory Council ("IAC"). The e-mail stated as follows:

One of our largest corporate supporters, Greg Nelson, IAC Chair, just called me to get clarification on what is going on in the office. When I asked him what he was talking about he told me that [Roman] had called him last week and told him that [Poux] had fired everyone in the office and that he was getting ready to fire her. I told him that was not the case and I encouraged him to speak directly to [Poux].... He also told me that [Roman] had ask [sic] him to write a letter to the Dean indicating that she was the only one in the office doing any work, he told her that he did not feel comfortable doing this as he had only met her on two occasions.

Def.Ex. V.

Cox forwarded the e-mail regarding Nelson to Spiro adding that "[Roman] is doing a great deal of damage." Def.Ex. U. Spiro responded stating "I want to know whether [Roman's] comments to Greg Nelson are grounds for summary dismissal. This is malicious and slanderous. If her comments represent insufficient grounds, then at the very least [Roman] should receive a final warning letter about lying and slander. We really need to put a stop to this." Def.Ex. W.

Poux then had a telephone conversation with Nelson wherein Nelson summarized his telephone conversation with plaintiff. Poux memorialized his conversation with Nelson in an e-mail to Cox:

[Nelson] said that [Roman] called and indicated that she "had been removed from the [IAC]" ... (she never was a

part of it, i simply asked her to participate—via presentations about her work, etc. . . .) She also told him that she was having difficulties with me, that i had fired a number of people in the office (i terminated three work study students last week, two of whom worked for her) for budgetary reasons, which i stated, but also for work related and political reasons (which i dare not openly state)— they were very disrespectful of the empo staff, including me, save for [Roman]; we believe that they were disseminating information/rumors per doris' instructions, and we believe that they may have tampered with [Hendrick's] computer. anyhow, she also told him that i am mismanaging funds . . . and she requested that [Nelson] write a letter to the dean expressing concern about how empo is being run.

Def.Ex. X.

Plaintiff confirmed at deposition that she had a telephone conversation with Nelson, that she told him there were communications problems in the EMPO, that there was a lot of gossiping in the EMPO, that Poux had fired several students, that she was concerned for her position because of issues of credibility, and that she requested that Nelson write a letter to the Dean regarding her credibility. *See* Mar. 30, 1998 Roman Dep., at 252–57.

Discussions were held among Hopcroft, Spiro, Rehkulger and Cox regarding plaintiff's employment. *See* Cox Aff., at ¶ 23. Poux was ultimately informed to terminate plaintiff, which he did in a letter dated December 20, 1994. The grounds for termination cited in the letter included: repeated incidents in which Roman slandered or attempted to undermine Poux, EMPO and other Cornell staff and executives; insubordination; persistent lying; referring to the Committee on Special Education Projects as a "bunch of niggers" in front of the EMPO staff; stating that "Gloria Guilford is giving [Hopcroft] . . . blow jobs to be promoted to Director of Admissions" in front of the EMPO staff;

refusal to perform assigned tasks; using inappropriate language and engaging in inappropriate behavior with the EMPO staff; failing to abide by EMPO policies; and undermining the EMPO and Poux with a corporate sponsor of EMPO. *See* Def.Ex. EE. The letter concluded that "these acts, which have been verified in most of the cases by multiple witnesses, constitute gross insubordination. For the reasons described [ ], your employment with the university is terminated, and you are to vacate the premises immediately. Deborah Cox will assist you in gathering your personal property from your office." *Id.*

After her termination, a Step I Hearing was held pursuant to the grievance procedure. Plaintiff's grievance was denied. Pursuant to Human Resource Policy # 604 (Resolving Employee Concerns), Step II appeals go to the University Human Resources Services ("UHRS"). However, grievances alleging discrimination are referred to Cornell's Office of Equal Opportunity ("OEO") prior to Step II review. *See* Def.Ex. HH. Plaintiff's allegations of a violation of the personnel manual proceeded immediately to a Step II appeal. Plaintiff's complaint of discrimination was referred to the OEO.

At the Step II appeal, UHRS found that the EMPO did not violate the progressive discipline policy. *See* Pl.Ex. A. Plaintiff appealed the UHRS determination to Provost Malden Nesheim ("Nesheim"). By letter dated May 3, 1994, Nesheim affirmed stating that "I do not find grounds for me to change the decision of the College in this matter." *Id.*

Meanwhile, the OEO investigated plaintiff's allegations of discrimination. On March 16, 1995, Valerie Hayes ("Hayes"), Director of the OEO, issued a preliminary decision finding that plaintiff was not discriminated against. According to Hayes, "I sensed that [plaintiff] was not discriminated against by Claude Poux due to other predominant issues." Pl.Ex. M, at 11663. However, in a report dated April 7, 1995,

Hayes reversed her March 16 decision, finding discrimination on account of plaintiff's national origin. The basis for her finding was Poux's issuance of the English-only directive to plaintiff enunciated in his November 29, 1994 memorandum. Nonetheless, Hayes noted that "a finding of discrimination on the basis of national original —speak-English-only—does not vitiate the reasons provided for Doris Roman's discharge." *Id.*, at 11667. This finding was not sent to plaintiff.

In May 1995, plaintiff filed a charge of discrimination with the New York State Division of Human Rights ("DHR") and the Equal Employment Opportunity Commission ("EEOC") alleging that she was discriminated against on the basis of her sex and national origin. In support of the charge, plaintiff claimed that: (1) Poux failed to keep his promise to allow plaintiff a flexible schedule so she could attend law school; (2) Poux failed to keep his promise to sponsor plaintiff for induction into the National Hispanic Leadership Institute; (3) Poux disciplined plaintiff for unprofessional behavior, while other EMPO staff were not; (4) plaintiff received a warning letter from Poux on the accounts of "two biased support staff persons;" (5) plaintiff received a warning letter criticizing her for speaking in Spanish; (6) Poux is unable to work cooperatively with the director of women's programs and other female professionals; (7) Poux resisted plaintiff's efforts to improve administrative issues and carry out her job duties; (8) her requests for mediation were denied; and (9) she was terminated from her employment. Because plaintiff expressed her intention to commence litigation, the DHR discontinued its investigation into her charge on the ground of administrative convenience and issued a right to sue letter.

By letter dated June 8, 1995, Hayes provided plaintiff with her findings, which reversed, in part, her findings in April 1995. The June 8 letter stated that "[t]aken in its entirety, the evidence available to me during the course of this investigation shows that your claims of discrimination are not substantiated by the evidence. You were terminated from your position ... for work performance, which the evidence supports as legitimate and not a pretext for discrimination." *See* Pl.Ex. R, at 10578.

Plaintiff then commenced the instant litigation asserting claims pursuant to 42 U.S.C. § 1981; Title VII, 42 U.S.C. § 2000e, et seq.; HRL § 296, and state law claims for breach of contract, negligent failure to supervise, failure to investigate, and the intentional infliction of emotional distress. Currently before the Court are defendants' motion to dismiss the Complaint pursuant to FED.R.CIV.P. 12(c), or, in the alternative for summary judgment pursuant to FED.R.CIV.P. 56, and plaintiff's cross-motion for summary judgment.

## II. DISCUSSION

### A. Whether the Instant Motions Will be Treated as Motions Pursuant to Rule 12 or Rule 56

Both parties have submitted materials outside the pleadings in connection with the pending motions. Because the Court has considered these submissions, and because the parties were on notice that defendants' motion was in the alternative for summary judgment, the Court will treat defendants' motion as one for summary judgment pursuant to FED.R.CIV. 56. *See Pani v. Empire Blue Cross Blue Shield,* 152 F.3d 67, 75 (2d Cir.), *cert. denied,* —— U.S. ——, 119 S.Ct. 868, 142 L.Ed.2d 770 (1999); *Morelli v. Cedel,* 141 F.3d 39, 45 (2d Cir.1998).

### B. Summary Judgment Standard

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, judgment may be entered in favor of the moving party if "there is no genuine issue as to any material fact and [ ] the moving party is entitled to judgment as a matter of law." *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202

(1986). On a motion for summary judgment, all facts must be construed in favor of the nonmoving party. *Id.; Buttry v. General Signal Corp.,* 68 F.3d 1488, 1492 (2d Cir.1995). Where the moving party has supported the motion by affidavits and/or documentary evidence, the nonmovant "may not rest upon mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in [ ] rule [56], must set forth specific facts showing that there is a genuine issue [of material fact] for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party." FED.R.CIV.P. 56(e); *BellSouth Telecommunications, Inc. v. W.R. Grace & Co.–Conn.,* 77 F.3d 603, 615 (2d Cir.1996).

"Because direct evidence of . . . discriminatory intent will rarely be found, 'affidavits and depositions must be carefully scrutinized for circumstantial proof which, if believed, would show discrimination.' " *Schwapp v. Town of Avon,* 118 F.3d 106, 110 (2d Cir.1997) (quoting *Gallo v. Prudential Residential Servs. L.P.,* 22 F.3d 1219, 1224 (2d Cir.1994)). "However, even in the discrimination context, a plaintiff must provide more than conclusory allegations of discrimination to defeat a motion for summary judgment." *Schwapp,* 118 F.3d at 110 (citing *Meiri v. Dacon,* 759 F.2d 989, 998 (2d Cir.1985), *cert. denied* 474 U.S. 829, 106 S.Ct. 91, 88 L.Ed.2d 74 (1985)).

With this standard in mind, the Court will now address the motions for summary judgment.

## C. Exhaustion of Administrative Remedies

Defendants first contend that plaintiff failed to include certain post-termination events in her administrative complaint. Specifically, defendants contend that plaintiff's filing of a second grievance under Cornell's internal grievance procedure and filing of a complaint with Cornell's OEO occurred prior to her filing of the administrative complaint with the DHR and EEOC, but were not included therein. According to defendants, these are separate and distinct events and it is not reasonable to suggest that the EEOC's investigation of the charge of discrimination would include such events.

Plaintiff responds that she is entitled to a "loose pleading" allowance because she filed her administrative complaint *pro se,* that Cornell's handling of plaintiff's grievance and complaint with the OEO naturally flow out of her allegations of discrimination, and that these acts are evidence of retaliation for plaintiff having engaged in protected activity.

■ "A district court only has jurisdiction to hear Title VII claims that either are included in an EEOC charge or are based on conduct subsequent to the EEOC charge which is 'reasonably related' to that alleged in the EEOC charge." *Butts v. City of New York Dept. of Housing Preservation and Dev.,* 990 F.2d 1397, 1401 (2d Cir.1993) (citing *Stewart v. I.N.S.,* 762 F.2d 193, 198 (2d Cir.1985); *Almendral v. New York State Office of Mental Health,* 743 F.2d 963, 967 (2d Cir.1984); *Goodman v. Heublein, Inc.,* 645 F.2d 127, 131 (2d Cir.1981); *Kirkland v. Buffalo Bd. of Educ.,* 622 F.2d 1066, 1068 (2d Cir.1980)). The purpose of the exhaustion requirement is to "encourage settlement of discrimination disputes through conciliation and voluntary compliance." *Butts,* 990 F.2d at 1401. The filing requirement provides notice to the party charged with a violation and gives that party an opportunity to comply with Title VII before the commencement of a lawsuit and to participate in conciliation. *Davis v. Weidner,* 596 F.2d 726 (7th Cir.1979).

■ Here, plaintiff's administrative charge of discrimination alleges that she was terminated because of discrimination on account of her sex and national origin. The Court also understands the charge to include a claim of retaliation. *See* Compl.,

Ex. A., at ¶ 11. Even though plaintiff made no mention of the grievance procedure or her complaint with the OEO in her administrative charge, the EEOC investigation of plaintiff's claim of retaliation would reasonably include these latter acts of alleged retaliation. *See Butts,* 990 F.2d at 1402 (The exhaustion requirement is satisfied as to "claims not raised in the charge ... where the conduct complained of would fall within the 'scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination.'"). These acts occurred immediately after plaintiff's termination and, therefore, constituted a continuation of the circumstances surrounding her termination. *See Robinson v. Shell Oil Co.,* 519 U.S. 337, 117 S.Ct. 843, 136 L.Ed.2d 808 (1997); *Durham Life Ins. Co. v. Evans,* 166 F.3d 139, 157 (3d Cir.1999); *Wanamaker v. Columbian Rope Co.,* 108 F.3d 462, 466 (2d Cir.1997); *Veprinsky v. Fluor Daniel, Inc.,* 87 F.3d 881, 891 (7th Cir. 1996) ("[F]ormer employees, in so far as they are complaining of retaliation that impinges on their future employment prospects or otherwise has a nexus to employment, do have the right to sue their former employers under [Title VII]."); *EEOC v. Cosmair, Inc.,* 821 F.2d 1085, 1088 (5th Cir.1987) (termination of severance benefits after filing of EEOC charge); *Pantchenko v. C.B. Dolge Co., Inc.,* 581 F.2d 1052, 1053 (2d Cir.1978).

### D. Title VII and HRL Claims[1]

Plaintiff claims that she was discriminated against on account of her national origin and sex and that she was retaliated against for complaining of prohibited discrimination. In her memorandum of law, plaintiff has conflated two methods of analysis adopted for Title VII: a "pretext case" invoking the *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) ("*McDonnell Doug-*

*las*"), burden-shifting scheme, and a mixed motive case as set forth in *Price Waterhouse v. Hopkins,* 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989) ("*Price Waterhouse*"). The Court will address all of plaintiff's claims of discrimination, including the analysis governing this case.

### 1. Discrimination on Account of Race or National Origin

#### a. Pretext

Under the familiar McDonnell Douglas burden-shifting analysis, a plaintiff claiming discrimination has the initial *de minimis* burden of establishing a *prima facie* case of discrimination. *See St. Mary's Honor Center v. Hicks,* 509 U.S. 502, 507–08, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993). "Establishment of the prima facie case in effect creates a presumption that the employer unlawfully discriminated against the employee." *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 254, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981).

Once a plaintiff has established a prima facie case, the burden of production then shifts to the employer to rebut this presumption by articulating a legitimate, non-discriminatory reason for its actions. *Fisher v. Vassar College,* 114 F.3d 1332, 1335–36 (2d Cir.1997) ("Fisher III"), *cert. denied,* —— U.S. ——, 118 S.Ct. 851, 139 L.Ed.2d 752 (1998). Although the burden of production shifts to the defendant, the ultimate burden of persuasion remains always with the plaintiff. *Raskin v. The Wyatt Co.,* 125 F.3d 55, 65; *see also Norton v. Sam's Club,* 145 F.3d 114, 118 (2d Cir.), *cert. denied,* —— U.S. ——, 119 S.Ct. 511, 142 L.Ed.2d 424 (1998).

If the defendant proffers a legitimate, nondiscriminatory reason for a challenged employment action, "the presumption raised by the prima face case is rebutted, and drops from the case." *St. Mary's,* 509

---

1. Because New York courts require the same standard of proof for claims brought under the HRL as for those brought under Title VII, the following analysis applies to both the Title VII and HRL claims. *See Leopold v. Baccarat, Inc.,* 174 F.3d 261, 264 n. 1; *Tomka v. Seiler,* 66 F.3d 1295, 1305 n. 4. (2d Cir.1995).

U.S. at 510, 113 S.Ct. 2742. (internal quotations and citations omitted). "The plaintiff then has the opportunity to demonstrate 'that the proffered reason was not the true reason for the employment decision, and that race was.' " *Fisher III*, 114 F.3d at 1336 (quoting *St. Mary's*, 509 U.S. at 507–08, 113 S.Ct. 2742). The plaintiff's opportunity to show the employer's proffered reason was false now merges with her ultimate burden to persuade the trier of fact that she has been the victim of discrimination. *St. Mary's*, 509 U.S. at 508, 113 S.Ct. 2742; *Burdine*, 450 U.S. 248, 101 S.Ct. at 1095; *see also Cronin v. Aetna Life Ins. Co.*, 46 F.3d 196, 203 (2d Cir. 1995) ("[T]he plaintiff is not required to show that the employer's proffered reasons were false or played no role in the employment decision, but only that they were not the only reasons and that the prohibited factor was at least one of the 'motivating' factors."). On summary judgment, "the judge must analyze the evidence, along with the inferences that may be reasonably be drawn from it, and decide if it raises a jury question as to whether the plaintiff was the victim of discrimination." *Fisher III*, 114 F.3d at 1347; *see also Stern v. Trustees of Columbia Univ.*, 131 F.3d 305 (2d Cir.1997); *Renz v. Grey Advertising*, 135 F.3d 217, 221–22 and n. 5 (2d Cir.1997).

■ The Court will assume, without deciding, that plaintiff has established a *prima facie* case of discrimination. *See Fierro v. Saks Fifth Avenue*, 13 F.Supp.2d 481, 488 (S.D.N.Y.1998) (and cases cited). Defendants, in turn, have proffered nondiscriminatory reasons for its employment decision—namely that plaintiff was terminated because she did not act as part of the EMPO team, she was insubordinate on multiple occasions, she acted in an unprofessional manner in the EMPO office, she violated EMPO policies, and her actions, particularly those in contacting Nelson, tended to undermine the operations of the EMPO. Specifically, the termination letter

sent to plaintiff pointed to the following incidents as the reasons for termination:

(1) on September 21, 1994, plaintiff allegedly referred to the Committee on Special Education Projects as a "bunch of niggers" to Hendricks;

(2) on September 29, 1994, plaintiff stated at an EMPO meeting that "Gloria Guilford is giving John Hopcroft ... blow jobs to be promoted;"

(3) on October 27, 1994, plaintiff allegedly told Hendricks that she was going to work to destroy Poux personally and professionally;

(4) plaintiff was insubordinate towards Poux and refused to perform an assigned task;

(5) on November 11, 1994, plaintiff used inappropriate language and engaged in inappropriate behavior after having been previously warned about such conduct;

(6) on November 17, 1994, plaintiff unilaterally changed EMPO policy by permitting a student to use the fax machine; and

(7) on or about December 4, 1994, plaintiff inappropriately telephoned Nelson, a corporate sponsor of EMPO.

*See* Def.Ex. EE. This is sufficient evidence to satisfy defendants' burden in the *McDonnell Douglas* scheme. *See Hollander*, 172 F.3d 192, 199–200; *Quinn*, 159 F.3d at 769; *Austin v. Ford Models, Inc.*, 149 F.3d 148, 152 (2d Cir.1998); *Hollander v. American Cyanamid Co.*, 895 F.2d 80, 83 (2d Cir.1990). Thus, this case boils down to a determination of the ultimate question in any Title VII case: whether plaintiff has presented sufficient admissible evidence from which a rational factfinder could infer that, more likely than not, plaintiff was the victim of intentional discrimination.

■ Before addressing plaintiff's evidence, the Court notes the existence of a strong inference that defendants terminated plaintiff for non-discriminatory reasons. This inference derives from the fact that plaintiff was hired and fired by the same

individuals within a relatively short time period. Defendants hired plaintiff knowing that she was a white, Hispanic female. In fact, the evidence demonstrates that they may have favored her for this very same reason. As the Fourth Circuit has noted:

> One is quickly drawn to the realization that claims that employer animus exists in termination but not in hiring seem irrational. From the standpoint of the putative discriminator, it hardly makes sense to hire workers from a group one disliked (thereby incurring the psychological costs of associating with them), only to fire them once they are on the job. Therefore, in cases where the hirer and the firer are the same individual[s] and the termination of employment occurs within a relatively short time span following the hiring, a strong inference exists that discrimination was not a determining factor for the adverse action taken by the employer..... The relevance of the fact that the employee was hired and fired by the same person[s] within a relatively short time span comes at the third stage of the [*McDonnell Douglas*] analysis.... [T]his fact creates a strong inference that the employer's stated reason for acting against the employee is not pretextual. The plaintiff still has the opportunity to present countervailing evidence of pretext, but in most cases involving this situation, such evidence will not be forthcoming. In short, employers who knowingly hire workers within a protected group seldom will be credible targets for charges of pretextual firing.

*Proud v. Stone*, 945 F.2d 796, 797 (4th Cir.1991) (internal quotations and citations omitted); *accord Chiaramonte v. Fashion*

*Bed Group, Inc.*, 129 F.3d 391, 398 (7th Cir.1997), *cert. denied,* —— U.S. ——, 118 S.Ct. 1795, 140 L.Ed.2d 936 (1998); *Bradley v. Harcourt Brace & Co.*, 104 F.3d 267, 270 (9th Cir.1996); *Brown v. CSC Logic, Inc.*, 82 F.3d 651, 658 (5th Cir.1996); *Evans v. Technologies Applications & Serv. Co.*, 80 F.3d 954, 959 (4th Cir.1996); *Buhrmaster . v. Overnite Transp. Co.*, 61 F.3d 461, 463–64 (6th Cir.1995), *cert. denied,* 516 U.S. 1078, 116 S.Ct. 785, 133 L.Ed.2d 736 (1996); *LeBlanc v. Great Am. Ins. Co.*, 6 F.3d 836, 847 (1st Cir.1993), *cert. denied,* 511 U.S. 1018, 114 S.Ct. 1398, 128 L.Ed.2d 72 (1994); *Brennan v. Metropolitan Opera Ass'n, Inc.*, 1998 WL 193204, at *11 (S.D.N.Y. April 22, 1998). Indeed, the Second Circuit has adopted this reasoning stating that this is a factor that "strongly suggest[s] that invidious discrimination was unlikely." *Grady v. Affiliated Cent., Inc.*, 130 F.3d 553, 560 (2d Cir.1997), *cert. denied,* —— U.S. ——, 119 S.Ct. 349, 142 L.Ed.2d 288 (1998); *see Banks v. The Travelers Cos.*, 180 F.3d 358, 366 (2d Cir. 1999).

Plaintiff first argues that Poux's English-only instruction was discriminatory.[2] Defendants respond that the English-only instruction was necessary because two EMPO employees had complained after the fax machine incident that plaintiff used Spanish to exclude them from conversations and that it is inappropriate for someone to switch to another language for the purpose of excluding persons from a conversation. *See* Hopcroft Dep., at 25–27.

A speak-English instruction may form the basis of an inference of national origin discrimination. *See* 29 C.F.R. § 1606.7(b)[3]; *Fields*, 115 F.3d at 120; *Garcia v. Spun Steak, Co.*, 998 F.2d 1480, 1489 (9th Cir.1993), *cert. denied,* 512 U.S.

---

2. As noted earlier, on November 29, 1994, Poux drafted a "Set of Concerns" to plaintiff stating, among other things, that "[h]aving extended conversations in Spanish in the presence of individuals who do not understand Spanish is inappropriate and inconsiderate and will cease immediately." *See* Def. Ex. S.

3. That section reads that:

> An employer may have a rule requiring that employees speak only English at certain times where the employer can show that the rule is justified by business necessity.

1228, 114 S.Ct. 2726, 129 L.Ed.2d 849 (1994); *Garcia v. Gloor*, 618 F.2d 264, 268 (5th Cir.1980), *cert. denied*, 449 U.S. 1113, 101 S.Ct. 923, 66 L.Ed.2d 842 (1981). However, under the facts and circumstances of this case, the English-only instruction is insufficient to demonstrate that discrimination was the likely reason for plaintiff's termination.

■ All decisions of which this Court is aware have held that English-only rules are not discriminatory as applied to bilingual employees where there is a legitimate business justification for implementing such a rule. *See Spun Steak*, 998 F.2d at 1490; *Gloor*, 618 F.2d at 271; *Kania v. Archdiocese of Phila.*, 14 F.Supp.2d 730, 736 (E.D.Pa.1998); *Tran v. Standard Motor Prods., Inc.*, 10 F.Supp.2d 1199, 1210 (D.Kan.1998); *Prado v. L. Luria & Son, Inc.*, 975 F.Supp. 1349, 1354 (S.D.Fla. 1997); *Long v. First Union Corp. of Virginia*, 894 F.Supp. 933, 942 (E.D.Va.1995), *aff'd*, 86 F.3d 1151 (4th Cir.1996); *Gonzalez v. The Salvation Army*, 89–1679–CIV–T–17 (M.D.Fla.1991), *aff'd*, 985 F.2d 578 (11th Cir.1993), *cert. denied*, 508 U.S. 910, 113 S.Ct. 2342, 124 L.Ed.2d 252 (1993); *compare Rivera v. Baccarat, Inc.*, 1997 WL 400119, at *4 (S.D.N.Y. July 15, 1997) (denying defendant's motion for summary judgment where "[a]s yet, the defendant has proffered no evidence on [the issue of business necessity].")*. Several courts have held that an English-only policy designed to reduce intra-office tensions is a legitimate business reason. *See Kania*, 14 F.Supp.2d at 736; *Tran*, 10 F.Supp.2d at 1210; *Long*, 894 F.Supp. at 942.

■ Here, plaintiff is fluent in English and Spanish. *See* Pl. 7.1(a)(3) statement, at ¶ 3. Baylor and Hendricks, however, do not understand Spanish. There were interpersonal conflicts and a feeling of uneasiness within the EMPO. *See, e.g.,* Roman Mar. 30, 1998 Dep., at 137–38 ("I think the entire EMPO office relationship deteriorated."); 162–63, 187, 188 ("I was concerned about the issue of the staff not talking to me. . . . And the gossip had got-

ten so bad that I would walk into the office and silence would break."); Def.Ex. N. After the fax machine incident, Hendricks and Baylor complained to Poux that plaintiff was conversing in Spanish to exclude them from conversations. *See* Baylor Aff., at ¶ 4; Def.Ex. DD. In response, plaintiff was instructed not to carry on extended conversations in Spanish in front of non-Spanish speaking persons. Defendants did not strictly prohibit plaintiff's use of Spanish in the EMPO. *See* Def.Ex. S, T at p. 10083. Defendants' purported goals of avoiding or lessening interpersonal conflicts, preventing non-foreign language speaking individuals from feeling left out of conversations, and preventing non-foreign language speaking individuals from feeling that they are being talked about in a language they do not understand, are legitimate business reasons justifying its English-only rule. *See Kania*, 14 F.Supp.2d at 736; *Tran*, 10 F.Supp.2d at 1210; *Long*, 894 F.Supp. at 942. Plaintiff's contention that she was hired, in part, because of her ability to speak Spanish with Latino students, that her duties included retaining services for Spanish speaking students, and that she often spoke to students in Spanish without being reprimanded, see Pl. 7.1(a)(3) statement, at ¶ 5 and Def.Ex. T, tends to support defendants' contention that the English-only rule "was implemented to relieve a tense working environment." *Long*, 894 F.Supp. at 942.

■ Plaintiff next argues that defendants' reasons for terminating her were pretextual and that discrimination was the real reason because she was treated differently than non-Latino employees. Plaintiff points to two instances where she alleges she was treated differently than non-Latinos. Plaintiff argues that: (1) she was treated more severely than non-Latino employees for using profanity in the office; and (2) that the non-Latino employees in the EMPO office were afforded mediation for their concerns, while she was not. According to plaintiff, Poux responded to

Baylor's use of profanity in the office by sending a memo to the entire department without subjecting her to any discipline, whereas plaintiff was disciplined for engaging in unprofessional conduct in the office. The undisputed evidence before the Court does not support plaintiff's allegation that she was treated differently than others on account of her national origin.

The use of profanity in the office had escalated such that Cox and Poux felt it necessary to formally address the issue. *See* Cox.Aff., at ¶ 8. In response to an exchange of vulgarities between Poux and Baylor, Poux issued the October 28, 1994 e-mail to the entire EMPO staff, warning that future instances of inappropriate conduct in the office would be unacceptable and that disciplinary action, where appropriate, would be taken.[4] *See* Def.Ex. L. There is no evidence that Baylor or Hendricks (the only other EMPO members) engaged in inappropriate conduct after Poux sent this e-mail. On the other hand, on November 11, 1994, Baylor and Hendricks complained to Cox that plaintiff used profanity in the office, raised her voice, and had threatened them with the loss of their jobs. *See* Cox Aff., at ¶ 9, Def.Ex. BB, CC, DD, Pl.Ex. A, Mar. 24, 1995 letter from Roman to Nesheim, at p. 3. While denying having made certain statements, plaintiff admitted that she overreacted and used an inappropriate "tone and [ ] choice of words." *See* Pl. Response to Statement of Material Facts, at ¶ 14; Def.Ex. T; Cox.Aff., at ¶ 9; Pl.Ex. A., Mar. 24, 1995 letter from Roman to Nesheim, at p. 3 ("I do not deny the incident . . . in which a heated discussion occurred amongst Ann [Hendricks], Sonja [Baylor], and myself."). Based upon this report and the other circumstances surrounding the November 11 incident, Poux issued a disciplinary warning to plaintiff stating that "insubordination, threatening and abusive behavior, be it physical, verbal and/or psychological, as well as repeated prevarication about individuals, will not be tolerated. . . . This is an official University warning to you that if there are ever displays of such behavior again, further disciplinary action, including the possibility of termination, will result." *See* Def.Ex. P. This was not discriminatory because Poux was simply implementing progressive discipline. Plaintiff was issued this formal reprimand because she violated EMPO policy after previously being warned about such behavior.

Furthermore, plaintiff's behavior on November 11, 1994 went beyond the mere use of profanity, but extended to threatening EMPO employees with the loss of their jobs. Thus, plaintiff was not similarly situated with Baylor or others. *See Phillips v. Holladay Property Servs., Inc.*, 937 F.Supp. 32, 37 (D.D.C.1996) ("[T]o be deemed 'similarly-situated', the individuals with whom the plaintiff seeks to compare his/her treatment must have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it.") (quoting *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir.1992)), *aff'd*, 1997 WL 411695 (D.C.Cir. 1997). Plaintiff offers no evidence that other EMPO employees engaged in similar behavior after the October 28, 1994 memorandum or that other EMPO employees were not subjected to discipline for engaging in inappropriate behavior. Accordingly, no rational factfinder could conclude that this purported instance is sufficient to demonstrate that discrimination was a motivating factor in her termination.

Plaintiff also alleges that "[i]n contrast with the problems and complaints raised by Ms. Baylor and Ms. Hendricks, I was

---

4. The parties dispute the impetus for this e-mail. Defendants contend that it was a result of the entire staff's use of inappropriate language. Plaintiff, on the other hand, insists it was the result of an incident between Baylor and Poux. *See* Cox.Aff., at ¶ 8. For purposes of defendants' motion for summary judgment, the Court will credit plaintiff's version.

never afforded mediation for my concerns or to address the accusations of misconduct directed against me. As the only Hispanic in the office and the only woman administrator I was treated differently." *See* Pl.Ex. I, at 5. Plaintiff offers no evidence, however, that defendants afforded mediation for Baylor and/or Hendricks. Conclusory allegations are insufficient to overcome a properly supported motion for summary judgment. *Schwapp*, 118 F.3d at 110. Furthermore, plaintiff's claim is contrary to the evidence that plaintiff had almost weekly meetings with Cox and/or Poux to discuss her concerns. *See* Pl.Ex. I, at 6; Cox Aff., at ¶ 5. In particular, plaintiff spoke with Cox and Poux regarding the November 11 incident. *See Id.;* Cox Aff., at ¶ 9. Moreover, Poux processed her complaints in accordance with the University's grievance procedure, thereby affording plaintiff an opportunity for mediation. *See* Pl.Ex. I, at 7–8.

■ Plaintiff next claims that a December 24, 1994 memorandum from Poux is evidence of discriminatory animus. The memorandum states, in part, that:

> Doris Roman was terminated the Tuesday prior to X-mas for a million and one reasons. She will be filing a lawsuit and mobilizing the Latino students to raise hell. Beware. She is doing this in conjunction with Gregory Medina. You may be barraged by angry, ill-informed students, mostly Latino, who will give you a very hard time.

*See* Pl.Ex. T. While this document makes references to Latinos, that does not necessarily impute discriminatory animus to Poux's conduct. This document, drafted after plaintiff's termination, demonstrates Poux's understanding that plaintiff believed herself to have been terminated because of her ethnicity, that she intended to commence litigation against the University claiming discrimination, and that she was marshaling support from Latino students. This memorandum does not suggest an improper basis for plaintiff's termination. *See, e.g., Fisher v. Vassar College,* 70 F.3d 1420, 1439 (2d Cir.1995) (Stating that a person's " 'sense of being discriminated against' is not evidence."), *rehearing en banc,* 114 F.3d 1332, *cert. denied,* —— U.S. ——, 118 S.Ct. 851, 139 L.Ed.2d 752 (1998).

■ Plaintiff next attempts to support her claim of discrimination by alleging that certain job responsibilities were taken away in early December 1994 and that on December 6, 1994, Poux fired her work study students. Assuming these allegations to be true, no rational factfinder could conclude that they are sufficient evidence of prohibited employment discrimination. Rather, the evidence demonstrates much dissatisfaction with plaintiff's professionalism and behavior as early as mid-November 1994. In fact, defendants were already contemplating firing plaintiff. *See* Cox Aff., at ¶¶ 11, 14; Def.Ex. N. Plaintiff offers no evidence that defendants' decisions to take away certain job responsibilities were motivated by discrimination. It is defendants' prerogative as plaintiff's employer to determine what tasks she will and will not perform. *See Gloor,* 618 F.2d at 268–69 ("[U]nless imposed by a statute, the rules of the workplace are made by . . . the employer."). Furthermore, Poux explained that the work study students had to be discharged because there was insufficient funding to pay their salaries. There is ample evidence in the record of budgetary difficulties within the EMPO and, absent any evidence that Poux terminated Latino students, but not students of other ethnicities, this is a valid, non-discriminatory reason for discharging the work study students. *See Josey v. John R. Hollingsworth Corp.,* 996 F.2d 632, 639 (3d Cir.1993).

■ Plaintiff next points to an incident whereby Poux allegedly failed to provide her with a timely letter of sponsorship with respect to her application to participate in the National Hispana Leadership Conference. According to plaintiff, she had requested a letter of sponsorship from Poux on several occasions and told him

that she needed to submit the response by 4:00 p.m. on December 8, 1994, but she did not receive the letter until almost 5:00 p.m. Thus, because plaintiff believed she had not received the letter in time, she opted not to fax the letter. Defendants respond that the evidence demonstrates that Poux made the letter available to plaintiff at approximately 2:00 p.m. on December 8, 1994, and that plaintiff failed to submit the letter. Specifically, defendants point to an e-mail time stamped 2:04 p.m. on December 8, 1994 wherein Poux wrote to plaintiff stating "the letter has been prepared and is in your mailbox, please fax it at your convenience." *See* Def.Ex. WW. Regardless of when the letter was actually provided, Poux's alleged failure to timely provide plaintiff with the sponsorship letter is not indicative of discrimination. There is no apparent connection, or nexus, between Poux's alleged failure to prepare the letter in a timely manner and plaintiff's national origin or her termination. *See Ogiba v. Business Servs. Co. of Utica*, 20 F.Supp.2d 379, 383 (N.D.N.Y.1998) (and cases cited). In fact, a review of the e-mail exchange between Poux and plaintiff demonstrates that Poux was concerned about funding plaintiff's trip to the conference, but that he had no objection to her otherwise attending. *See* Def.Ex. WW.

■ Next, plaintiff argues that "[plaintiff] would not have been fired, but for the Greg Nelson telephone call. Mr. Nelson's affidavit shows that Mr. Poux and Ms. Baylor misrepresented their information about the call. This direct contradiction of the core facts by an independent witness supports a finding that Poux's reasons for terminating Ms. Roman were pretextual." Pl.Memo. of Law, at 14. There are some discrepancies regarding what exactly transpired between plaintiff and Nelson and what Nelson told Poux and Baylor about his conversations with plaintiff. None of these discrepancies, however, are material. It is undisputed that plaintiff did some work with the Industrial Advisory Council ("IAC"), of which Nelson was the chair;

that Nelson worked for Exxon, a corporate sponsor of the EMPO; and that plaintiff contacted Nelson without the prior approval of Poux, see Mar. 30, 1998 Roman Dep. at 235–37. Plaintiff admitted at deposition that she told Nelson that Poux was firing students, see *id.* at 238; that there were communications problems in the EMPO, see *id.;* that certain communications Nelson sent to the EMPO were not shared with her, see *id.,* at 240; that there was much gossip in the EMPO, see *id.,* at 243; that the gossip made it difficult for the EMPO to accomplish its tasks, see *id.,* at 253; that plaintiff felt she was being discredited, see *id.,* at 239, 252; that plaintiff "was concerned for her position because of issues of credibility," see *id.,* at 256; and that she requested that Nelson send a letter to Hopcroft on her behalf. *See id.,* at 257–58. Nelson confirmed the contents of his telephone conversation with plaintiff in a letter to Poux dated January 30, 1995, stating that:

> Doris Roman telephoned me on December 4th, 1995. She said she had received several disciplinary letters from Claude Poux, her supervisor, and was concerned this could lead to her termination.

> She asked me to write a letter to Dean Hofcroft [sic] about her performance working on the Industrial Advisory Council (IAC) plans.

*See* Def.Ex. Y. According to an affidavit submitted by Nelson, plaintiff also told him that she believed Poux to be incompetent, that Poux had removed her from the IAC, and that a certain company questioned Poux's accounting of the expenditure of funds contributed by that company. *See* Apr. 20, 1999 Nelson Aff., at ¶ 5. Nelson relayed this information to Poux who, in turn, relayed it to Cox, who then reported it to Spiro. *See id.,* at ¶ 6; Def.Exs. W, X, V.

Plaintiff has failed to demonstrate that the Nelson incident was not a valid reason for terminating her employment, or that discrimination is the more likely reason for

defendants' decision to discharge her. The facts fully support defendants' contention that plaintiff made inappropriate contacts with Nelson and that such contacts could reasonably tend to undermine the operations of the EMPO.

Plaintiff next argues that she was terminated prior to her first grievance hearing, that she complained about the disciplinary warnings given to her by Poux, that many of the grounds for her warnings and her termination were based upon the biased opinions of Hendricks and Baylor, and that the University did not properly follow its grievance procedure. The Court cannot discern a showing of prohibited national origin discrimination by the above-listed arguments. At most, they may be indicative of a failure by defendants to abide by any University disciplinary procedures or of retaliation.[5] *See* discussion *infra* at 47. Further, defendants were entitled to rely upon the information provided by Hendricks and Baylor. *See, e.g., Mopkins v. St. Louis Die Casting Corp.*, 423 F.Supp. 132, 135 (E.D.Mo.1976) (employer may use subjective criteria and rely upon complaints of co-workers), *aff'd*, 569 F.2d 454 (8th Cir.1978). Although there unquestionably was tension and a certain amount of dislike among the EMPO staff, defendants had ample evidence to support their conclusion that plaintiff often acted in an inappropriate, insubordinate, and unprofessional manner. *See id.* Absent evidence of discriminatory motivation, this Court "does not sit as a super-personnel department that reexamines an entity's business decisions, and therefore, a court may not second-guess an employer's personnel decision absent demonstrably discriminatory motive." *Phillips*, 937 F.Supp. at 37 n. 7 (internal quotations and citations omitted). The arguments offered by plaintiff do not suggest that the reasons for her termination were a pretext for unlawful discrimination or that her termination was motivated by prohibited discrimination.

Moreover, while Poux signed and delivered the termination letter, the undisputed evidence demonstrates that several persons, including Spiro, Cox, and Rehkulger, were involved in the decisions to hire and fire plaintiff. *See* Cox Aff., at ¶ 3, Pl.Ex. B., Poux Dep., at 178–79; Def.Ex. F; Def. Ex. N; Def.Ex. W; Def.Ex. EE; Cox Dep., at 88. However, plaintiff's evidence of alleged discrimination discussed above solely relates to Poux. *See Price Waterhouse v. Hopkins*, 490 U.S. 228, 109 S.Ct. 1775, 1804–05, 104 L.Ed.2d 268 (1989) (O'Connor, J., concurring) ("[S]tatements by nondecisionmakers, or statements by decisionmakers unrelated to the decisional process itself, [cannot] satisfy plaintiff's burden ..."); *See, e.g., Bush v. Dictaphone Corp.*, 161 F.3d 363, 369 (8th Cir. 1998); *Laurin v. Providence Hosp.*, 150 F.3d 52, 58 (1st Cir.1998); *Rivers–Frison v. Southeast Missouri Comm. Treatment Ctr.*, 133 F.3d 616, 619 (8th Cir.1998); *Smith v. Firestone Tire & Rubber Co.*, 875 F.2d 1325, 1330 (7th Cir.1989) (remarks made by a decisionmaker do not demonstrate illegitimate criteria unless related to the specific employment action at issue); *Flynn v. Goldman, Sachs & Co.*, 836 F.Supp. 152, 163 (S.D.N.Y.1993). Plaintiff offers no evidence that the other decisionmakers were either unduly influenced by Poux's alleged discriminatory attitude or that they themselves acted for prohibited discriminatory reasons.

■ The evidence overwhelmingly demonstrates that plaintiff was terminated because of personality conflicts, her lack of professionalism, insubordination, violation

---

**5.** The Court recognizes that departures from procedural regularity can, in certain circumstances, from the basis of an inference of discrimination. *See Stern v. Trustees of Columbia Univ. in the City of New York*, 131 F.3d 305, 313 (2d Cir.1997). Here, however, plaintiff offers no evidence that she was entitled to a grievance hearing before her termination or that others who were similarly situated were provided hearings before termination. At best, and as will be discussed, defendants' handling of the grievance procedure would tend to support plaintiff's retaliation claim.

of the EMPO's policies, and her inappropriate contact with corporate sponsors of the EMPO. *See Hollander,* 172 F.3d at 201 (employee terminated because of interpersonal problems); *Phillips,* 937 F.Supp. at 34 (employee terminated for insubordination for failure to lower her voice at a meeting); *Fenton v. The Pritchard Corp.,* 926 F.Supp. 1437, 1447 (D.Kan.1996) (employee terminated for behaving in a threatening manner); *Mills v. Gibson Greetings, Inc.,* 872 F.Supp. 366, 371 (E.D.Ky.1994) (employee terminated for arguing); *James v. Runyon,* 843 F.Supp. 816, 824 (N.D.N.Y. 1994) (employee terminated due to her attitude), *aff'd,* 47 F.3d 1158 (2d Cir.), *cert. denied,* 516 U.S. 841, 116 S.Ct. 126, 133 L.Ed.2d 75 (1995). "Indeed, the record ... suggests that the likeliest basis for [plaintiff's termination] was that the [EMPO] members disliked her and lacked respect for her." *Fisher v. Vassar College,* 70 F.3d 1420, 1436 (2d Cir.1995).

■ Dislike of an individual, even if that individual is a member of a protected group, without more, does not amount to prohibited discrimination. While some of the reasons offered by defendants for plaintiff's termination may have been pretexts, that does not require a finding that they were pretexts for unlawful discrimination. *See Hollander,* 172 F.3d at 201; *Fisher III,* 114 F.3d at 1337–38, 1345. "Individual decision-makers may intentionally dissemble in order to hide a reason that is non-discriminatory but unbecoming or small-minded, such as back-scratching, log-rolling, horse-trading, institutional politics, envy, nepotism, spite, or personal hostility." *Fisher III,* 114 F.3d at 1337. Reviewing the record as a whole in the light most favorable to plaintiff, and considering the totality of the circumstances, see *Richardson v. New York State Dep't. of Correctional Service,* 180 F.3d 426, 436 (2d Cir. 1999), there is insufficient evidence "that would permit a rational factfinder to infer that the discharge was actually motivated, in whole or in part, by discrimination on the basis of [national origin]." *Grady,* 130 F.3d at 561.

In light of the strong presumption against discrimination enunciated in *Grady* and *Proud,* see discussion *supra* at 235–36, the lack of evidence tending to support plaintiff's claim that she was the victim of prohibited discrimination, and the overwhelming amount of evidence demonstrating that plaintiff was terminated due to personality conflicts and insubordination, defendants are entitled to summary judgment on this cause of action.

**b. Mixed Motive**

■ Plaintiff is not entitled to a mixed motive analysis under *Price Waterhouse* because she has failed to point to a smoking gun or thick cloud of smoke. *See Raskin,* 125 F.3d at 60 (quoting *Lightfoot v. Union Carbide Corp.,* 110 F.3d 898, 913 (2d Cir.1997); *Ostrowski v. Atlantic Mutual Ins. Cos.,* 968 F.2d 171, 182 (2d Cir. 1992)). As discussed, her allegations of discrimination on the basis of national origin simply do not demonstrate that a discriminatory reason was a motivating factor in her termination. Plaintiff has proffered no evidence of policy documents or statements directly reflecting a discriminatory attitude. *See id.* Further, because plaintiff is unable to meet the level of proof required to carry her ultimate burden in a pretext case, *a fortiori,* she cannot establish a *prima facie* case of mixed-motive discrimination. *See Raskin,* 125 F.3d at 60.

**c. Race–Based Hostile Work Environment**

■ Title VII is not limited to economic or tangible discrimination, but extends to "[racial] harassment so severe or pervasive as to alter the conditions of the victim's employment and create an abusive working environment." *Faragher v. City of Boca Raton,* 524 U.S. 775, 118 S.Ct. 2275, 2283, 141 L.Ed.2d 662 (1998) (internal quotations and citations omitted). "Title VII affords employees the right to

work in an environment free from discriminatory intimidation, ridicule, and insult." *Meritor Savings Bank, FSB v. Vinson,* 477 U.S. 57, 106 S.Ct. 2399, 2404–05, 91 L.Ed.2d 49 (1986); *see Williams v. County of Westchester,* 171 F.3d 98, 100 (2d Cir. 1999).

 In the present case, plaintiff asserts a hostile work environment claim against defendants. To prevail on her hostile work environment claim, plaintiff must demonstrate: (1) that her workplace was permeated with discriminatory intimidation that was sufficiently severe or pervasive to alter the conditions of her work environment, see *Faragher,* 524 U.S. 775, 118 S.Ct. at 2283 n. 1; and (2) that a specific basis exists for imputing the conduct that created the hostile environment to Cornell. *Schwapp,* 118 F.3d at 110; *see Van Zant v. KLM Royal Dutch Airlines,* 80 F.3d 708, 715 (2d Cir.1996).

 To be actionable, "[t]he conduct alleged must be severe and pervasive enough to create an environment that 'would reasonably be perceived, and is perceived, as hostile or abusive.'" *Schwapp,* 118 F.3d at 110; *see also Faragher,* 524 U.S. 775, 118 S.Ct. at 2283. In determining whether an environment is sufficiently hostile or abusive, courts examine all of the circumstances, including the frequency of the discriminatory conduct, its severity, whether it is physically threatening or humiliating or a mere offensive utterance, and whether it unreasonably interferes with an employee's work performance. *Faragher,* 524 U.S. 775, 118 S.Ct. at 2283. "Simple teasing, offhand comments, and isolated incidents (unless extremely serious), will not amount to discriminatory changes in the terms and conditions of employment." *Id.* (internal citations and quotations omitted). "In order to meet [her] burden, the plaintiff must show 'more than a few isolated incidents of racial enmity,' 'there must be a steady barrage of opprobrious racial comments,' evidence solely of 'sporadic racial slurs' does not suffice." *Williams,* 171 F.3d at 100 (quot-

ing *Snell v. Suffolk County,* 782 F.2d 1094, 1103 (2d Cir.1986); *Schwapp,* 118 F.3d at 110). In other words, Title VII is not to be used as "a general civility code," but is actionable only for conduct sufficiently "extreme to amount to a change in the terms and conditions of employment." *Id.* Pervasiveness and severity are independent and equal grounds on which to support violations of Title VII. *Faragher,* 524 U.S. 775, 118 S.Ct. at 2283 (extremely serious isolated incidents may be actionable); *Harris v. Forklift Systems, Inc.,* 510 U.S. 17, 114 S.Ct. 367, 370, 126 L.Ed.2d 295 (1993) (there must be conduct that is "sufficiently severe or pervasive") (emphasis supplied); *see Witt v. Roadway Express,* 136 F.3d 1424, 1432 (10th Cir.), *cert. denied,* —— U.S. ——, 119 S.Ct. 188, 142 L.Ed.2d 153 (1998); *Quinn v. Green Tree Credit Corp.,* 159 F.3d 759, 768 (2d Cir. 1998); *Tomka,* 66 F.3d at 1305; *Torres v. Pisano,* 116 F.3d 625, 631 n. 4 (2d Cir.), *cert. denied,* —— U.S. ——, 118 S.Ct. 563, 139 L.Ed.2d 404 (1997).

 In support of her hostile work environment claim, plaintiff points to the above-discussed allegations and, in particular, the speak-English only instruction. However, as discussed, plaintiff has failed to submit sufficient evidence to permit a fair-minded jury to conclude that defendants' conduct was based on plaintiff's race or national origin, see, e.g., *Galdieri–Ambrosini v. National Realty & Dev. Corp.,* 136 F.3d 276, 289 (2d Cir.1998), or that the alleged conduct was sufficiently severe or pervasive to adversely alter plaintiff's work environment. *See Williams,* 171 F.3d at 101–102. For example, plaintiff has failed to point to any evidence that defendants used racial epithets, racially derogatory comments, or any other evidence suggesting that defendants' actions were based on her race or national origin. In fact, plaintiff admitted at deposition that she could not recall hearing any comments by anybody at the College that reflected bias against Hispanics. *See* Oct. 19, 1998 Roman Dep., at 12, 42–43, Def.

Statement of Undisputed Facts, at ¶ 61. Rather, the evidence reveals that defendants acted for legitimate, nondiscriminatory business reasons.

### 2. Gender–Based Discrimination

In her Complaint, plaintiff also alleges that she was the victim of gender-based discrimination. None of the above-cited instances are sufficient to support a claim for gender-based discrimination. There simply is no evidence that defendants intentionally discriminated against plaintiff because of her gender.

▆ Plaintiff also claims that she was the victim of a gender-based hostile work environment. In her response to defendants' interrogatories, plaintiff identified the following instances as evidence of a gender-based hostile work environment: (1) in August 1994, Poux gave plaintiff a stack of "fashion citations," instructed her to use them, and made a negative comment about her appearance; (2) in the Spring of 1994, Poux issued a fashion citation to a female student; (3) in September 1994, Poux stated at a staff meeting that another woman, Myers, was overweight and unhealthy, and criticized her clothing as making her look heavier; (4) some time between September 1994 and November 1994, Poux told Myers she should dress more fashionably; (5) Poux commented that an extremely pale female student dressed in black clothing looked like the "walking dead"; (6) in October 1994, Poux criticized plaintiff's colorful, casual clothing she was wearing on her way to a conference and stated that she could not represent Cornell looking that way; (7) in November 1994, Poux told plaintiff she should go to the gym and lose weight; (8) in September 1994, Poux told the EMPO staff they should get more exercise; (9) between August 1994 and September 1994, Poux gossiped about Cornell employees; and (10) in August or September 1994, Poux told plaintiff that Linda Van Ness had removed her blouse at a party and went drinking with some students. How-

ever, plaintiff spends little time addressing this claim in her submissions to the Court.

The standards discussed above with respect to a racially hostile work environment similarly apply to claims of a sex-based hostile work environment. See discussion supra at 242. Upon reviewing the totality of the circumstances, the Court concludes that no fair-minded jury could find that plaintiff was the victim of a hostile work environment on account of her gender. No reasonable person would perceive plaintiff's allegations as hostile or abusive. Similarly, none of Poux's alleged comments, even if true, unreasonably interfered with the performance of plaintiff's work. See Leopold, 174 F.3d 261, 267–68.

The alleged incidents were isolated and sporadic and were not sufficiently severe or pervasive to alter the terms or conditions of plaintiff's work environment. Thus, plaintiff cannot, as a matter of law, sustain a claim that she was discharged because of her sex and her claim of sex discrimination must be dismissed.

### 3. Retaliation

▆ Defendants next move for summary judgment dismissing plaintiff's claim of retaliation. Retaliation claims pursuant to 42 U.S.C. § 2000e–3 are subject to the familiar McDonnell Douglas burden shifting analysis previously described. See discussion supra at 234. To establish a prima facie case of retaliation, plaintiff must demonstrate that the employee was engaged in protected activity, that the employer was aware of that activity, that the employee suffered adverse employment decisions, and that there was a causal connection between the protected activity and the adverse employment action. See Quinn v. Green Tree Credit Corp., 159 F.3d 759, 769; Manoharan v. Columbia Univ. College of Physicians & Surgeons, 842 F.2d 590, 593 (2d Cir.1988).

### a. Whether Plaintiff Engaged In Protected Activity

▆ "To prove that [s]he engaged in protected activity, the plaintiff need not

establish that the conduct [s]he opposed was in fact a violation of Title VII." *Manoharan*, 842 F.2d at 593 (citing *Davis v. State University of New York*, 802 F.2d 638, 642 (2d Cir.1986)). "However, the plaintiff must demonstrate a 'good faith, reasonable belief that the underlying challenged actions of the employer violated the law.'" *Id.* (citing *Abel v. Bonfanti*, 625 F.Supp. 263, 267 (S.D.N.Y.1985); *Francoeur v. Corroon & Black Co.*, 552 F.Supp. 403, 412 (S.D.N.Y.1982)); *Quinn*, 159 F.3d at 769.

On November 29, 1994, plaintiff sent an e-mail to Cox referencing a warning she received from Poux and stating that "I may be PERCEIVING HARASSMENT." (Emphasis in original). Pl. ex. F. Plaintiff argues that "Cox should have reasonably felt that Ms. Roman was complaining about sexual or racial harassment." Pl. Mem. of Law, at 17. Harassment can be many things and the use of that term does not automatically implicate Title VII. The e-mail itself does not indicate that plaintiff believed defendants were engaged in unlawful employment practices. Plaintiff also alleges in her memorandum of law that her December 6, 1994 grievance challenging the English-only instruction constitutes protected activity. Plaintiff's grievance letter makes no reference to discrimination or improper employment practices. *See* Def.Ex. T. Nevertheless, drawing all reasonable inferences in plaintiff's favor, the Court concludes that these instances are sufficient to satisfy her *de minimis* burden of demonstrating that she engaged in protected activity.

### b. Whether Plaintiff Suffered Adverse Employment Action

With respect to the second prong, plaintiff points to the following instances of adverse employment action: (1) her termination; (2) defendants handling of her post-termination grievance procedure; (3) defendants handling of plaintiff's complaint of discrimination to the OEO; and (4) that Cornell had opposed her application for unemployment benefits. Defendants argue that the second, third, and fourth instances of alleged adverse employment action were reasonable defensive measures and did not alter the terms or conditions of plaintiff's employment. The Court finds that all but Cornell's opposition to her application for unemployment benefits are sufficient to support the second prong of her *prima facie* case of retaliation. Plaintiff's termination unquestionably constitutes an adverse employment action. *See Quinn*, 159 F.3d at 769. Defendants' handling of plaintiff's post-termination grievance and discrimination complaint could reasonably be considered to be a continuation of the termination procedure and related to her efforts to be reinstated. Alternatively, defendants' post-termination conduct could be found to have a sufficient nexus to employment to fall within the protection of Title VII. *See Robinson*, 519 U.S. 337, 117 S.Ct. 843, 136 L.Ed.2d 808; *Durham Life Ins. Co.*, 166 F.3d at 157; *Wanamaker*, 108 F.3d at 466; *Veprinsky*, 87 F.3d at 891. The negative outcome of these procedures are sufficient to satisfy plaintiff's *de minimis* burden of demonstrating adverse employment action.

Cornell's opposition to plaintiff's application for unemployment benefits, however, is not an adverse employment action. This was a permissible, non-discriminatory legal position taken by Cornell in opposition to plaintiff's application for such benefits. Employers frequently challenge a former employee's application for unemployment insurance benefits when the employer has terminated the employee for cause. *See, e.g., In re Class*, 689 N.Y.S.2d 781 (3d Dep't 1999). Without more, reasonable legal positions, although adverse to plaintiff, do not violate the anti-retaliation provisions of Title VII. *See, e.g., United States v. New York City Transit Auth.*, 97 F.3d 672, 677 (2d Cir.1996). Plaintiff offers no evidence that Cornell opposed her application for unemployment benefits for discriminatory reasons. For example, plaintiff presents no evidence that Cornell did

not oppose such applications by non-Latinos.

### c. Whether There is a Causal Connection Between the Protected Activity and the Adverse Employment Action

Defendants argue that there can be no causal connection with respect to plaintiff's allegations of retaliation regarding the handling of her grievance and OEO complaint because "these incidents took place after her termination so they could not possibly satisfy [the] evidentiary burden of establishing a causal connection." Def.Mem. of Law, at 26. Plaintiff complained of harassment to Cox on November 30, she filed a grievance on December 6, the grievance hearing was scheduled for late December, and she was fired on December 20, prior to the grievance hearing. The temporal relationship between the protected activity and this adverse employment action is sufficient to satisfy this prong of the *prima facie* case. *See Quinn,* 159 F.3d at 769. The additional acts of alleged retaliation (the internal grievance and the OEO complaint) occurred from January through June 1995. The continuing nature of the alleged retaliation is sufficient to support the requisite causal connection for purposes of demonstrating a *prima facie* case. It is of no moment that these latter incidents occurred after plaintiff's termination because they may be found to have a sufficient nexus to plaintiff's employment. *See Robinson,* 519 U.S. 337, 117 S.Ct. 843, 136 L.Ed.2d 808; *Durham Life Ins. Co.,* 166 F.3d at 157; *Wanamaker,* 108 F.3d at 466; *Veprinsky,* 87 F.3d at 891.

Having found that plaintiff has established a *prima facie* case of retaliation, the burden shifts to defendants to articulate a legitimate non-discriminatory reason for taking adverse employment action. As has been fully discussed, defendants argue that plaintiff was terminated for legitimate business reasons. *See supra,* at 235–36. However, defendants offer no explanation for the post-termination incidents, including its handling of plaintiff's grievance and the OEO complaint. Accordingly, defendants have not met their burden under the *McDonnell Douglas* scheme with respect to these incidents and, thus, triable issues of fact remain regarding whether plaintiff was retaliated against for engaging in protected activity. *See Richardson,* at 444.

### E. State Law Claims

#### 1. Plaintiff's Seventh, Eighth, and Ninth Causes of Action

In her opposition papers, plaintiff concedes to the dismissal of her seventh, eighth, and ninth causes of action and, accordingly, those claims are dismissed. *See* Pl.Mem. of Law, at 8.

#### 2. Breach of Contract (Sixth Cause of Action)

Plaintiff claims that she was denied her contractual entitlement to a legitimate grievance procedure and to an investigation into her complaint of discrimination. While plaintiff admits that she is an at will employee, see Pl.Mem. of Law, at 6, she continues to argue that "[d]efendants [ ] violated the contractual agreement between plaintiff and [ ] Cornell providing for equal employment rights, discipline and discharge policies, methods and procedural safeguards, and protections against retaliation." Compl., at 56. Defendants respond that plaintiff was an at will employee and that the personnel manual containing the disciplinary process and the grievance procedure is not a contract with plaintiff because it does not cover the terms and conditions of her employment.

"It is well settled [under New York law] that 'absent an agreement establishing a fixed duration, an employment relationship is presumed to be a hiring at will, terminable at any time by either party.'" *Fitzgerald v. Martin–Marietta,* 681 N.Y.S.2d 895, 896 (3d Dep't 1998) (quoting *Sabetay v. Sterling Drug,* 69 N.Y.2d 329, 333, 514 N.Y.S.2d 209, 506 N.E.2d 919

(1987)). Plaintiff fails to identify any express contractual agreement with defendants concerning the terms of her employment.

■ "An employee may recover, however, by establishing that the employer made the employee aware of its express written policy limiting its right of discharge and that the employee detrimentally relied on that policy in accepting the employment. Where these elements are proved, the employee in effect has a contract claim against the employer." *De Petris v. Union Settlement Ass'n, Inc.,* 86 N.Y.S.2d 406, 410, 633 N.Y.S.2d 274, 657 N.E.2d 269 (1995) (citing *Weiner v. McGraw–Hill, Inc.,* 57 N.Y.2d 458, 465–466, 457 N.Y.S.2d 193, 443 N.E.2d 441 (1982)). "Mere existence of a written policy, without the additional elements identified in *Weiner,* does not limit an employer's right to discharge an at will employee or give rise to a legally enforceable claim by the employee against the employer." *Id.*

■ Here, all plaintiff is able to point to is a written policy without any of the requisite *Weiner* elements. The personnel manual does not restrict defendants' ability to terminate plaintiff at will. *See Fitzgerald,* 681 N.Y.S.2d at 896. First, while not dispositive, the manual expressly states that "the policies contained within are not conditions of employment, and the language is not intended to create a contract." Def.Ex. FF; *see LaDuke v. Hepburn Med. Ctr.,* 239 A.D.2d 750, 753, 657 N.Y.S.2d 810 (3d Dep't 1997). This would tend to negate the reasonableness of reliance. *See LaDuke,* 239 A.D.2d at 753, 657 N.Y.S.2d 810. Second, having reviewed the submitted portions of the personnel manual, the Court is unable to identify any sections restricting defendants' right to terminate plaintiff at will. While the discipline section of the manual, policy no. 603, provides for a system of progressive discipline, it does not limit the reasons for which defendants may terminate an employee. *See* Def.Ex. GG. In fact, that policy expressly notes that "[t]here may be instances where the policy violated or the action taken by an employee is of such a serious nature that immediate ... discharge is justified. Examples of such conduct could include insubordination ... but are not limited to these." *Id.* Third, there is no evidence that plaintiff relied on the provisions of the personnel manual in accepting her employment with Cornell.

In fact, a similar argument was recently rejected by the Appellate Division, Third Department in *Maas v. Cornell Univ.,* 245 A.D.2d 728, 666 N.Y.S.2d 743 (3d Dep't 1997). In *Maas,* a professor asserted a breach of contract claiming that Cornell failed to comply with the procedures contained in the Campus Code and in the College's Procedures. The Appellate Division held that "[t]he rules and regulations outlined in these documents constitute academic and administrative prerogatives and this Court will not strain to convert them into a contract." *Id.* For these reasons, plaintiff's sixth cause of action must be dismissed. *See Bartenbach v. Board of Trustees of Nassau Library Sys.,* 239 A.D.2d 372, 657 N.Y.S.2d 200 (2d Dep't 1997).

## III. CONCLUSION

For the foregoing reasons, defendants' motion for summary judgment is GRANTED IN PART and DENIED IN PART. Plaintiff's Second, Third, Sixth, Seventh, Eighth, and Ninth Causes of Action are DISMISSED. Defendants' motion is DENIED as to the First, Fourth and Fifth Causes of Action for retaliation. Plaintiff's cross-motion for summary judgment is DENIED in its entirety.

**IT IS SO ORDERED**